FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2013 APR 29 AM 10: 17

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 68704-2-I |
| | ) | consolidated with |
| G.N.G., dob 12/19/02, and | ) | No. 68705-1-I |
| A.N.T., dob 08/03/00, | ) | |
| | ) | |
| Minor Children. | ) | |
| | ) | |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| DEPARTMENT OF SOCIAL AND | ) | |
| HEALTH SERVICES, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JOEL SALAS GARCIA, | ) | |
| | ) | FILED: April 29, 2013 |
| Appellant. | ) | |
| | ) | |

VERELLEN, J. — Joel Garcia appeals from the trial court order terminating his parental rights to two of his children. He argues that the State failed to offer or provide services capable of correcting his parental deficiencies by not adequately tailoring their efforts to his cognitive ability. But the record amply supports the trial court's determination to the contrary and demonstrates that Garcia would not have benefited from further services due to his minimization of the concerns that prompted the State's intervention, refusal to participate in services offered, and inability to address

circumstances that jeopardized his children's well-being. His argument that termination of his parental rights was not in the children's best interests is similarly unpersuasive. We affirm.

## FACTS

The following facts were found by the trial court and are unchallenged on appeal. Joel Garcia is the father of G.N.G. (born 12/19/02) and A.N.T. (born 08/30/00). The children suffered from chronic neglect. The home they lived in was very dirty. They experienced difficulty emotionally and academically at school. Garcia exhibited cognitive limitations, as well as chronic mental health conditions. The mother's rights were previously terminated, and she is not a party to this appeal.

The children and Garcia received services through Renton Area Youth Services (RAYS) for over a year and a half before the dependency petition was filed in December of 2009. Sarah Ramstad, the family's RAYS counselor, provided in-home counseling, family sessions with Garcia and the children, and school-based therapy for A.N.T. She collaborated with teachers to help A.N.T. manage his behaviors. She also provided hygiene kits and instruction on bathing, teeth brushing, and food handling. Ramstad, like Garcia, speaks Spanish.

Garcia did not follow through with several services Ramstad attempted to offer or provide. Although Ramstad referred Garcia to a Spanish-language parenting class that offered free dinner for the family and homework help for the children while the father received parent coaching, he chose not to attend. At a psychiatric appointment in June 2009, A.N.T. was prescribed medication for ADHD and scheduled for a follow-up appointment. Ramstad, recognizing Garcia's cognitive limitations, reviewed the

2

instructions with him and emphasized the importance of A.N.T. taking his medication every morning. But Garcia failed to ensure that A.N.T. took the medication, and the follow-up appointment did not occur as scheduled.

On June 11, 2009, Ramstad made a referral to Child Protective Services (CPS) after she arrived at the home and the father answered the door with marijuana on his breath. The home was filthy and the children were in his care at the time.

By the fall of 2009, significant chronic neglect had affected the children physically, emotionally, and psychologically. From the summer of 2009 until he was placed in out-of-home care in December of 2009, A.N.T. did not receive his ADHD medication, even though he had been breaking down in school and crying uncontrollably. The father reported he did not seek medication for A.N.T. because he thought he was doing well. Garcia also failed to take the children to necessary dental appointments in the fall of 2009. A.N.T. had untreated cavities. G.N.G. also had untreated cavities, which resulted in an abscess.

In October 2009, Garcia was evicted from his apartment. For about two months after the eviction, Garcia and the children lived alternately in a church and in a truck. Ramstad had tried to help Garcia with housing referrals prior to his eviction, but he did not follow through with them.

Teachers at G.N.G. and A.N.T.'s school became increasingly concerned about their welfare due to their poor hygiene and troubling behavior. School staff tried to assist Garcia and the children by offering various meetings, service plans, and counseling services. A public health nurse was also provided to the family. CPS was

3

again contacted during this time due to concerns for the children's medical and dental health and inconsistent attendance in counseling at RAYS.

While in the care of their father, the children were very aggressive and fought with one another. Ramstad and the father observed A.N.T. become very angry, choke his sister, and throw her to the ground. Ramstad made a second CPS referral on October 15, 2009 because Garcia did not respond appropriately after A.N.T. choked G.N.G. and threw her to the ground.

On October 29, 2009, Garcia agreed to a safety plan proposed by CPS social worker Carmina Chang. He agreed to have the children shower at least every other day and to send them to school in clean clothes. He agreed to keep the house cleaner, give A.N.T. his ADHD medication daily, take a parenting class if he was unable to manage the children's aggression, and to schedule medical and dental appointments for the children. But Garcia did not follow through with the safety plan.

A dependency petition was filed in December 2009 after Garcia failed to abide by the safety plan and the identified problems were not remedied despite the services that were made available. The children were removed from his custody on December 15, 2009. At the time, he was the sole caregiver for the children. An agreed order of dependency was entered on February 17, 2010.

The dispositional order required Garcia to participate in an alcohol/drug evaluation and random urinalysis. He was also required to complete a psychological evaluation and participate in parenting classes. Garcia participated in several different chemical dependency programs, completing an inpatient program and engaging in outpatient meetings. He also completed parenting courses. Dr. Alysa Ruddell, the

psychologist who evaluated Garcia, found that he had depression and borderline intellectual functioning.

Supervised visitation was ordered because Garcia's housing was inappropriate for visits. His visits were consistent and timely, but he lacked engagement with A.N.T. Garcia showed concern and caring for G.N.G., and G.N.G.'s therapist and the CASA testified to the bond between G.N.G. and her father.

The State filed a termination petition. After hearing several days of testimony, the King County Superior Court ordered that Garcia's parental rights should be terminated.

Garcia appeals.

ANALYSIS

To prevail in a petition to terminate parental rights, the State must prove by clear, cogent, and convincing evidence: (1) That the child was found dependent; (2) that the court entered a dispositional order; (3) that the child was removed from the custody of the parent for at least six months pursuant to a finding of dependency; (4) that services ordered under RCW 13.34.130 were offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future were offered or provided; (5) that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; and (6) that continuation of the parent and child relationship clearly diminishes

the child's prospects for early integration into a stable permanent home.[1] The State must also prove by a preponderance of the evidence that termination of parental rights is in the best interests of the child.[2]

A trial court's findings of fact entered following a termination hearing must be supported by substantial evidence in the record, and must, in turn, support the trial court's conclusions of law.[3] Findings of fact supported by substantial evidence are binding on the reviewing court.[4] Unchallenged findings of fact are treated as verities on appeal.[5]

Here, it is undisputed that the elements of RCW 13.34.180(1), (2), and (3) were met. Garcia contends that all reasonable services were not meaningfully offered and provided and that the termination of his parental rights was not in the best interests of the children. We disagree.

*Necessary Services Offered or Provided*

Garcia contends the State failed to prove that all services reasonably available and capable of correcting his parental deficiencies were expressly and understandably offered or provided.[6] This is so, he argues, because the State failed to accommodate

---

[1] RCW 13.34.180; RCW 13.34.190(2); In re Welfare of S.V.B., 75 Wn. App. 762, 768, 880 P.2d 80 (1994); In re Dependency of A.V.D., 62 Wn. App. 562, 568, 815 P.2d 277 (1991).

[2] RCW 13.34.190(1)(b); S.V.B.. 75 Wn. App. at 775.

[3] In re Dependency of C.B., 79 Wn. App. 686, 692, 904 P.2d 1171 (1995).

[4] State v. Maxfield, 125 Wn.2d 378, 385, 886 P.2d 123 (1994).

[5] Fuller v. Employment Sec. Dep't. of State of Wash., 52 Wn. App. 603, 605, 762 P.2d 367 (1988).

[6] Garcia specifically assigns error to the trial court's finding of fact 2.55: "Services ordered under RCW 13.34.130 have been expressly and understandably offered or provided and all necessary services reasonably available, capable of

his mental disabilities by not providing services tailored to his intellectual and developmental ability which "would have allowed him to understand the instruction and effectively parent his children."[7] But Garcia's argument is contradicted by the trial court's unchallenged findings and the record.

At trial, the State was required to demonstrate by clear, cogent, and convincing evidence that the parent was offered or provided all reasonably available, potentially efficacious services.[8] These services must be tailored to the individual parent's needs.[9]

Ample evidence supports the trial court's finding that the State met its burden of offering and providing services. The trial court's unchallenged findings of fact include many references to the services offered and provided and the providers' efforts to effectively tailor services to meet Garcia's cognitive challenges:

> 2.24 The father engaged in services at PATH (Sound Mental Health) with Micah Kurtz between November 2009 and October 12, 2010. . . . The father's attendance at this service was initially consistent for the first three months, but thereafter became sporadic and only occurred when Mr. Kurtz located the father. Every time they met, Mr. Kurtz had to reexplain to the father how he could assist the father. Because Mr. Garcia appeared to Mr. Kurtz to possibly have cognitive deficits, he set up a regular appointment schedule with the father to assist him in attending. Mr. Kurtz repeatedly assisted the father with housing applications and job training; however, the father did not follow through with referrals and recommendations.

---

correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided to the father, including a drug/alcohol evaluation; random urinalysis; a psychological evaluation with parenting component and cognitive testing; parenting classes; [and] mental health counseling/treatment."

[7] Appellant's Br. at 2.

[8] RCW 13.34.145; RCW 13.34.180; In re Dependency of T.L.G., 126 Wn. App. 181, 200, 108 P.3d 156 (2005); In re Dependency of H.W., 92 Wn. App. 420, 428, 961 P.2d 963 (1998).

[9] H.W., 92 Wn. App. at 429-30.

2.25   The father completed Parenting the Positive Discipline Way on March 22, 2010 at Southwest Youth and Family Services.

. . . .

2.30   The father completed a psychological evaluation with parenting component with Dr. Alysa Ruddell, Ph.D., a credible witness, on October 12, 2010.  Mr. Garcia has depression, the symptoms of which were noted by others assisting the family before the children went into care. . . .

. . . .

2.32   . . . The father was referred to mental health staff at SEA MAR.  Recommendations included that he accept his alcoholism and follow a recovery program including participating in self-help support group(s), identify his major relapse issues and internalize the benefits of belonging to a peer group.

2.33   The father completed inpatient drug treatment between January 26, 2011 and February 25, 2011. . . . The father's discharge recommendations included that he continue with medication management, enroll in counseling at Consejo and that he continue in Phase II of drug treatment including attending self-help support groups.

. . . .

2.36   The father engaged in a drug and alcohol assessment at Consejo Counseling and Referral Service on June 7, 2011 and the report was issued on July 8, 2011.  The father was diagnosed with alcohol dependence. On August 5, 2011, the father enrolled in the Consejo outpatient chemical dependency treatment program.  The father's treatment requirements include weekly group sessions, random urinalysis testing, and individual sessions.

2.37   The father met with Ralph Preston at Sound Mental Health on July 12, 2011.  The father reported that his CPS social worker referred him for mental health counseling and that he is depressed over his life situation.  He was referred for mental health services.[10]

Further evidence suggests that the service providers tailored their communications

to Garcia to no avail, as he failed to follow through with the services.  RAYS counselor

---

[10] Clerk's Papers at 520-22.

8

Ramstad testified that she repeatedly explained the importance of A.N.T. taking his medication. Yet despite her efforts, Garcia still failed to make sure A.N.T. took the medication. Importantly, Garcia's explanation was that he believed A.N.T. did not need the medication, not that he didn't understand the directions. CPS social worker Chang testified that she explained the safety plan to Garcia "very thoroughly," and that he appeared to be "very much in agreement with it."[11] Nevertheless, Garcia did not follow the safety plan.

Moreover, the evidentiary record demonstrates that Garcia had deficiencies that could not be remediated, that he denied or minimized his challenges, that he was unwilling to participate in some services, and that these factors prevented him from obtaining the parenting skills he needed to learn. The trial court's unchallenged findings of fact include the following:

> 2.30 . . . Depression can sometimes be remediated through medication and/or counseling, but Mr. Garcia has not engaged in this service. Mr. Garcia also has borderline intellectual functioning, an Axis 2 diagnosis that cannot be remediated.

> . . . .

> 2.37 . . . [Sound Mental Health counselor] Preston made efforts to locate the father after his 3-4 contacts including going to the father's reported address; however, his efforts to reach the father to discuss his counseling options were unsuccessful.

> . . . .

> 2.45 The father's engagement in services has at times been delayed by his unwillingness to participate in the court ordered services. The father has only been willing to do some services when the court reorders them despite agreeing to participate in all recommendations for services in the dispositional order entered over two years ago.

---

[11] Report of Proceedings (Mar. 21, 2012) at 63.

. . . .

2.47    The father continues to believe that his care for the children before the filing of the dependency action was fine and he had no parenting issues at that time or currently.

. . . .

2.50    The father denies having any issues with chemical dependency or mental health. The father consistently reports to the social worker, CASA, and Rodrigo Ramirez that providers tell him that he does not need mental health services; however, the father has not provided any documentation to support this claim. The providers that have worked with the father all report that they recommended mental health services for him or that they did not tell the father he did not need mental health services.

. . . .

2.51    Services to address chemical dependency and mental health were offered to the father; however, the father has not made appropriate use of these services in part because he continues to deny that he has any problems. The father would need to acknowledge the need to change in order for these services to correct his deficiencies.

2.52    The father's continued denial or minimization of problems prevents the services offered from correcting his parental deficiencies. In addition, the father's borderline intellectual functioning, without almost fulltime assistance, precludes him from adequately parenting his children.

2.53    The father continues to believe that the reports of the children's poor hygiene while in his care was due to the children walking to and from school and getting their shoes dirty. The father's failure to acknowledge the significance and severity of the issues that led to the children's removal demonstrates that if the children were returned to his care today that they would be in the same or similar position that they were in the fall of 2009.

2.54    The father has demonstrated a sustained difficulty in meeting his own daily needs. He currently resides in a shed or unheated garage with no bathroom or kitchen facilities and apparently believes that he can provide for the children appropriately in that environment. It is

10

unlikely that the father will be able to meet the children's high needs when he is unable to consistently meet his own needs.[12]

These unchallenged facts, supported by substantial evidence, amply demonstrate that additional services would not be capable of correcting Garcia's parental deficiencies within the foreseeable future. When a parent is unwilling or unable to take advantage of services provided then the State is relieved of any obligation to provide additional services.[13]

Garcia's case is analogous to In re Welfare of A.J.R.[14] In A.J.R, the mother received extensive services to assist her with cleaning and personal hygiene, and a public health nurse provided in-home child care instruction.[15] Here, RAYS and the public health nurse provided extensive services to Garcia before the children were removed from his custody. As in A.J.R., the extensive services provided to Garcia before the children were removed did not remedy the neglect, poor hygiene, and behavioral issues. In A.J.R., as here, a qualified psychologist determined it was unlikely the parental deficiencies could be remedied so that the children could return home.[16] As was true in A.J.R., the evidence supports the determination that Garcia's treatment providers provided information and service referrals in a manner tailored to his cognitive needs.

---

[12] Clerk's Papers at 521-24.

[13] In re Dependency of Ramquist, 52 Wn. App. 854, 861, 765 P.2d 30 (1988); In re Welfare of Ferguson, 41 Wn. App. 1, 6, 701 P.2d 513 (1985); In re Dependency of P.A.D, 58 Wn. App. 18, 26-27, 792 P.2d 159 (1990).

[14] 78 Wn. App. 222, 896 P.2d 1298 (1995).

[15] Id. at 225-27.

[16] Id. at 228.

Garcia also argues that reversal is required because he was precluded from receiving services from the Department of Developmental Disabilities "that might have been tailored to his level of understanding, and that might have truly helped him parent his children."[17] He asserts that he was denied these services "likely due to [his] misdiagnosis" as having "borderline intellectual functioning," rather than mental retardation.[18]

But Garcia does not challenge the trial court's finding that "no evidence . . . changes the accuracy of this psychological assessment from October of 2010."[19] Moreover, this unchallenged finding is supported by the evidence. Dr. Ruddell testified that Garcia had borderline intellectual functioning, an Axis II diagnosis distinguishable from mental retardation. Dr. Ruddell explained that she did not diagnose Garcia with mental retardation, in part, because he was able to function in society, had been involved in a committed relationship with the children's mother, and had been able to work for periods of time.

Garcia was offered numerous services, many of which he refused to utilize. The services were specifically tailored to him. The providers testified that they arranged for Spanish-language services, took extra time and effort to ensure Garcia understood their directions, assisted him with paperwork, went to his home, and offered lessons about basic life skills, as well as treating his substance abuse and mental health conditions.

---

[17] Appellant's Br. at 6.

[18] Id. at 5. The purported misdiagnosis is evident, Garcia argues, from evidence that he is illiterate and can follow only simple verbal instructions, attended a "special school" in Mexico as a child, and had difficulty understanding instructions from his treatment providers due to cognitive deficits.

[19] Clerk's Papers at 521 (finding of fact 2.31).

Substantial evidence supports the trial court's determination that all reasonably available services, capable of correcting the identified parental deficiencies within the foreseeable future, were expressly and understandably offered or provided to Garcia. By contrast, no evidence demonstrated that any service capable of correcting his deficiencies was not offered.[20] There was no error.

*Children's Best Interests*

Garcia also argues that the court erred in entered finding of fact 2.73, "Termination of the parent-child relationship between the children and the father is in the children's best interest," as it is not supported by substantial evidence in the record. We disagree.

Once the State establishes the elements of RCW 13.34.180 by clear, cogent, and convincing evidence, the court must also find that an order of termination is in the best interests of the child.[21] When a parent has failed to rehabilitate over a lengthy dependency period, a court is "'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period'" while the parent seeks further rehabilitation.[22] The trial court is afforded broad discretion in making a "best interests" determination, and its decision receives great

---

[20] Garcia acknowledges that services through the Department of Developmental Disabilities are not available to an individual diagnosed with borderline intellectual functioning. See Appellant's Br. at 5-6.

[21] RCW 13.34.190.

[22] In re Dependency of T.R., 108 Wn. App. 149, 167, 29 P.3d 1275 (2001) (alteration in original) (quoting In re Dependency of A.W., 53 Wn. App. 22, 33, 765 P.2d 307 (1988)). A child has a right to "a safe, stable, and permanent home and a speedy resolution of any proceeding under this chapter." RCW 13.34.020.

deference on review.[23] The best interests of a child must be decided on the facts and circumstances of each case.[24]

Here, the trial court's factual findings are supported by substantial evidence, and amply demonstrate that termination of Garcia's parental rights was in the best interests of his children. Moreover, Garcia does not dispute the trial court's finding of fact that he "continues to pose the same risk of neglect to the children that he did when they were removed" from his care.[25] Given the unchallenged facts and their sound evidentiary basis, the trial court was entirely justified in finding that the children's best interests were served by terminating Garcia's parental rights.

Affirmed.

WE CONCUR:

_____

_____

_____

---

[23] In re Interest of J.F., 109 Wn. App. 718, 728, 37 P.3d 1227 (2001); In re Welfare of Young, 24 Wn. App. 392, 395, 600 P.2d 1312 (1979).

[24] A.V.D., 62 Wn. App. at 572.

[25] Clerk's Papers at 525 (finding of fact 2.67).