# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of<br><br>J.R.P.M,<br>D.O.B.: 11/06/2012,<br><br>Minor child.<br><br>STATE OF WASHINGTON,<br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES,<br><br>Respondent,<br><br>v.<br><br>CAYSEA MCBRIDE,<br><br>Appellant. | No. 73867-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br><br><br><br><br><br>FILED: July 25, 2016 |

TRICKEY, J. – CaySea McBride appeals an order terminating her parental rights to her child J.R.P.M. (J.M.). She contends the Department of Social and Health Services (Department) failed to prove several statutory prerequisites to termination. We disagree and affirm.

## FACTS

CaySea is the biological mother of a daughter, J.M., born on November 6, 2012. At the time of trial, CaySea was 21 years old and J.M. was 2 years old.

In August 2013, J.M. swallowed a dime while in her mother's care. Over the course of several days, she became lethargic and lost her appetite. By the time CaySea sought medical help, surgery was necessary to remove the coin. The incident resulted in a founded finding of neglect against CaySea by Child Protective Services (CPS).

On October 24, 2013, CPS removed J.M. from CaySea's care after CaySea's mother discovered bruises on J.M.'s chest.

In January 2014, CaySea and the Department executed an agreed order of dependency. Casey admitted to substance abuse and diagnoses of ADHD (attention deficit hyperactivity disorder), mood disorder NOS (not otherwise specified), marijuana dependence, and oppositional defiant disorder. She agreed to participate in a number of services, including a drug/alcohol evaluation and any treatment recommendations, random UAs that would be deemed complete after 90 days of "consistently clean, not missed, not diluted UAs," a psychological evaluation with a parenting component, parenting classes, and mental health counseling if recommended in the psychological evaluation.[1]

In July 2014, the Department returned J.M. to CaySea and her father under certain conditions, including compliance with a signed safety plan that required CaySea to take J.M. to Childhaven. Shortly thereafter, CaySea began keeping J.M. with her and not taking her to Childhaven. The Department also received "some disturbing phone calls . . . from the maternal grandmother [saying] she was very concerned about the child and that she had been left alone with the child and the parents had disappeared."[2]

In August 2014, the Department again removed J.M. from CaySea's care after an unannounced visit revealed several violations of the safety plan.

In December 2014, the Department filed a petition to terminate CaySea's parental rights.

---

[1] Clerk's Papers (CP) at 230 (finding of fact (FF) 2.8.1).
[2] 3 Report of Proceedings (RP) at 464.

At trial, a Department social worker, Jill Kegel, testified that she took over J.M.'s case shortly before entry of the agreed dependency order. Kegel testified that CaySea received substance abuse treatment as an adolescent. Nevertheless, CaySea told Kegel she smoked marijuana daily, that she partied with her friends, and that she was young and wanted to live her life. When asked if CaySea's marijuana use affected her behavior, Kegel said, "Absolutely. I mean . . . she was not getting out of bed to attend visits."[3] CaySea's visitation was inconsistent and Kegel "was constantly getting reports that she was late or not showing up for visits."[4] When Kegel asked CaySea about her visitation issues, CaySea said "she was up late with her friends" and "partying."[5]

Kegel testified that CaySea had mental health issues, that her "mood changed very frequently," and that her level of anger "really stood out."[6] CaySea would be talking calmly "and then just completely snap . . . and start cursing, yelling, [and] screaming."[7] Kegel was concerned that if CaySea acted this way on the phone, she would have a difficult time controlling her anger when overwhelmed by the demands and irritations of caring for a small child.

Kegel was also concerned about CaySea's ability to parent J.M. At the outset of the case, CaySea "was overwhelmed" and would leave J.M. in her mother's care until "she would start to get questioned by the shelter she was living in as to where the child was because she had to have the child with her in order to remain in that housing

---

[3] 1 RP at 37.
[4] 1 RP at 38.
[5] 1 RP at 38.
[6] 1 RP at 39.
[7] 1 RP at 39.

program."[8] When J.M. swallowed the dime, "it was several days of [J.M.] being lethargic and having a hard time with other foods, and CaySea being urged to take the child for medical treatment, before she finally did so, which resulted in [J.M.] needing to have surgery to have the coin removed . . . ."[9]

Kegel described the unannounced visit that resulted in J.M.'s second removal from CaySea's care. She testified that when she arrived at the motel, CaySea's room had "quite a few beer cans and a very pungent smell of marijuana."[10] CaySea subsequently arrived in a car with J.M. Kegel described Casey as "reeking of marijuana."[11] Because CaySea had violated the safety plan, and because CaySea and J.M. had to be out of the motel that night and had no plan for alternative lodging, Kegel removed J.M. for her own safety.

Kegel referred CaySea for Family Preservation Services, which included a parenting component. Although she was not totally consistent with that service, CaySea did make some progress. Kegel also referred her for a drug and alcohol evaluation. The evaluator recommended outpatient treatment, but CaySea said "she didn't need it," "didn't want to do it," and "continually refused" it.[12] Kegel repeatedly told CaySea that, contrary to her impressions, she did not need medical coverage for this service and that the Department would pay for it if she went to one of several providers.

---

[8] 1 RP at 42.
[9] 1 RP at 42.
[10] 1 RP at 51.
[11] 1 RP at 52.
[12] 1 RP at 46.

Kegel even assisted her in setting up an appointment with Sound Mental Health, but CaySea did not follow through. CaySea also did not follow through with a referral to Journey Home for housing assistance, and did not complete her service requirement of 90 days of clean, not-missed UA testing. As a result, CaySea had almost no unsupervised visitation with J.M.

Kegel recommended that CaySea's parental rights be terminated. Noting CaySea's failure to complete service requirements, inconsistent visitation, and general resistance to change, Kegel testified that there had been little progress, that CaySea was currently unfit to parent, and that termination was in J.M.'s best interest.[13] Kegel listed a number of parental deficiencies:

> [CaySea] is continuing to use substances. She's not complying with her service plan. She's not doing outpatient treatment. She's not engaged in individual counseling. She's denying that she has any parental deficiencies to begin with, which . . . right there is a huge risk. When she sat up here and said that she's gotten it from the beginning, that worries me. . . . [S]he doesn't have it. She . . . changes her story on a day-to-day basis, and she cannot sit here and tell me how she's going to care for [J.M.] and follow through with that. . . . I mean, just today I found out the visit provider dropped the visits because [CaySea] hasn't been consistent at them. . . . [S]he hasn't been consistent or stable in the child's life, and that right there is a . . . risk to this child.
> . . . .
> . . . I've heard her on numerous occasions say that she's going to do something and not do it.[14]

Kegel said that all necessary services had been understandably offered or provided and that CaySea never expressed any confusion or difficulty understanding what

---

[13] 2 RP at 278.
[14] 3 RP at 491-92.

she needed to do to avoid termination. Kegel saw little likelihood that conditions could be remedied so that J.M. could be returned to CaySea in the near future.

Shannon Rama, a chemical dependency counselor at Sound Mental Health, testified that she conducted a chemical dependency assessment of CaySea in 2014. In her assessment summary, which the court admitted into evidence, Rama stated that CaySea had received mental health care in the past and that her diagnoses included mood disorder NOS, ADHD, oppositional defiant disorder, and a possible diagnosis of bipolar disorder. She had prior arrests for assault and burglary. A 2011 assessment by Sound Mental Health concluded CaySea was cannabis dependent. Rama concluded in her 2014 assessment that CaySea suffered from cannabis and alcohol abuse "as evidenced by recurrent use resulting in a failure to fulfill major role obligations at home (CPS [i]nvolvement in custody issue)."[15] She recommended outpatient treatment, but CaySea did not follow through.

Randall Saager testified to CaySea's UA test results at his laboratory. Four UAs taken between January 28 and February 18, 2015 were positive for marijuana. The concentration decreased in each subsequent test, however.

Mental health counselor Parzival Popof testified that he worked with CaySea on parenting skills between September 2013 and early 2014. She missed multiple appointments but missed fewer as time went on. Popof testified that she completed all parenting modules but it took longer than normal because of her missed appointments.

---

[15] Exhibit (Ex.) 97.

Popof received a second referral from Family Preservation Services in July 2014. That referral focused on CaySea's housing, sobriety, and family interaction. CaySea's statements about treatment for substance abuse "usually were resistant. She felt that it was not an issue."[16] Popof ultimately saw no change in CaySea's progress toward sobriety. CaySea "had medium follow-through" with housing and some progress in the area of discipline and interaction with J.M.[17] But the latter progress was not implemented "very much, because there weren't a lot of visitations during the service."[18]

Popof also saw no improvement in CaySea's communication skills and emotional outbursts. He noted that CaySea

> had some resistance to complying with the goals because . . . she didn't necessarily agree with what was being asked of her to do it seemed. And so, she had . . . a stubbornness about submitting to the requests of the service team, you might say? So, as far as . . . what more could have been done or could be done in general, . . . I'm not sure. You know, the mother stated that she was generally aware of the consequences of her actions, but couldn't bring herself [to do] outpatient marijuana treatment.[19]

Psychologist Steve Tutty received a referral for CaySea in the fall of 2014. He diagnosed her as having inattentive type ADHD and alcohol and cannabis use disorders. He testified that her ADHD can cause difficulty with monitoring, tracking, and decision-making, and that her alcohol and marijuana use disorders "can impair her insight and judgment."[20] Dr. Tutty noted "a pattern of inconsistent visitations and a tendency to blame her setbacks and challenges onto others, which is consistent with the rebellious themes

---

[16] 2 RP at 324.
[17] 2 RP at 327.
[18] 2 RP at 331.
[19] 2 RP at 333-34.
[20] 3 RP at 379.

detected in testing."[21]  He concluded CaySea presented "a moderate risk toward the safety and wellbeing of [J.M.]."[22]  He recommended that CaySea achieve six to nine months of sobriety, attend eight to ten individual counseling sessions, attend regular visitation, and complete a parenting class prior to reunification.

Elena Jones testified that her employer, US Healthworks, received a referral for UA testing between January and April 2015.  Although CaySea should have come in for testing "one to two times a week" during that period, she only came in five times.[23]

Sharon Doak, J.M.'s court appointed special advocate (CASA), testified that she had "seen no progress with this case" and recommended termination.[24]  When she asked CaySea why she was not fully participating in services, CaySea said she "was upset with the Department" and "didn't feel she had to do any of it."[25]  Doak noted that J.M.

> is two years old.  She's a very vulnerable child at this point in her life.  She needs to have stability.  She needs to have consistency.  She needs all of those things that [CaySea] has not provided for her.  And it seems to me that she would be at risk to be returned home right now . . . .
> . . . .
>
> . . . [J.M.]'s been in dependency now since sometime in 2013.  At this point in time there has been no forward movement with this mother.  I can't see that there is going to be.  And I . . . can't see that there's any other way to . . . . move this child forward [other than termination.][26]

CaySea testified that she was treated for marijuana dependency between August 2009 and April 2010.  When asked why she did not comply with the outpatient treatment

---

[21] 3 RP at 380.
[22] 3 RP at 380.
[23] 3 RP at 410.
[24] 4 RP at 551.
[25] 4 RP at 538.
[26] 4 RP at 551, 553.

requirement during the dependency, she claimed she had problems with her medical insurance. When counsel pointed out that Kegel had referred her to agencies that would bill the Department for the treatment, CaySea said, "I remember her saying that there could be that, but not that that was possible."[27] She testified that "when I tried to enter . . . into the outpatient, they said that I needed to get a new evaluation" and that Kegel was not responding to calls from the treatment provider.

CaySea also testified that she was of two minds regarding outpatient treatment: "One was, yeah, okay, what's the harm? And then the other was, what is this saying if I do [the treatment]? And I just – I strongly feel like if I did that, it would be saying that what they're doing to my family is okay and it wasn't and it's not. It's not okay."[28] She understood that she had to "do the outpatient," but did not understand why.[29] She believed "the dependency had nothing to do with drugs or alcohol" and therefore did not understand why she had an obligation to undergo outpatient treatment.[30]

In addition, she testified she felt betrayed by CPS and the Department and wanted treatment "somewhere where CPS didn't have their . . . people in there or. . . didn't communicate or didn't work with so I would have a fair judgment."[31] CaySea admitted having similar "trust challenges" concerning the individual counseling requirement. She described a "battle within my head" and a need to "figure out which side I was going to go with, what I believed . . . was right or what I needed to do."[32]

---

[27] 1 RP at 133.
[28] 4 RP at 592.
[29] 4 RP at 604.
[30] 4 RP at 602.
[31] 4 RP at 599.
[32] 5 RP at 696.

9

CaySea testified that she thought she was in compliance with the UA requirement so long as her test results were improving. With respect to visitation, she admitted missing some visits but said those omissions were due to increased distance to the visits, bad timing with the bus, or occasional over-sleeping. When asked if she understood the consequences of not completing services, CaySea said, "I did not fully understand what I was signing when I signed the Dependency Order."[33] She also testified that when she asked about the services required in the order, she understood that "these are just the cut and dry things that need to be done every time a case is opened . . . and they need to make sure I'm okay in all areas I guess."[34]

CaySea's mother, Kelli McBride, testified that she never had safety concerns regarding CaySea's ability to care for J.M. The only concern she ever had was that CaySea "was very young" and inexperienced.[35]

The court terminated CaySea's parental rights and entered the following pertinent findings of fact and conclusions of law:

II. Findings

. . . .

2.8 Services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.
. . . .

2.8.1 The court ordered services for the mother were as follows:

---

[33] 1 RP at 132.
[34] 4 RP at 581-82.
[35] 5 RP at 707.

(a) Drug and Alcohol Evaluation and follow drug and alcohol treatment related recommendations and

(b) Random urinalysis two times per week and that the requirement shall be completed after 90 days of consistently clean, not missed, not diluted UAs.

(c) Psychological evaluation with a parenting component;

(d) Age appropriate parenting classes;

(e) Individual Mental Health counseling and follow recommendations and that this service is contested unless recommended by the psychological evaluation.

2.8.2 The Department referred the mother to Sound Mental Health, THS, and New Traditions for a drug and alcohol evaluation and referred the mother for random urinalysis.

2.8.3 The mother has attempted drug and alcohol treatment in the past including attempts at treatment at SeaMar. The mother completed a drug and alcohol evaluation with Sound Mental Health. In April 2014, Sound Mental Health assessed that mother has diagnoses of cannabis abuse and alcohol abuse as evidenced by recurrent use resulting in a failure to fulfill major obligations in the home. Sound Mental Health recommended Level 1.0 outpatient treatment which should consist of 2-3 groups per week, attendance at 1-2 community based sober supports, a minimum of monthly meetings with CD counselor and a mental health assessment. The Social Worker Jill Kegel sat with the mother and called Sound Mental Health to make an appointment with the mother to do another drug and alcohol evaluation. The mother did not engage in outpatient treatment and did not complete a mental health assessment.

2.8.4 The Department referred the mother to US Health Aurora to complete 90 days of random urinalysis testing. The mother provided many UAs that were positive for marijuana. The mother missed several UAs and failed to complete 90 days of not missed, not diluted, not positive UAs.

2.8.5 The Department referred the mother to Dr. Coder for a psychological evaluation and later to Dr. Steve Tutty for a psychological evaluation. The mother missed many appointments scheduled with Dr. Tutty. Dr. Tutty recommended that the mother show sobriety for six to nine months before considering reunification. Dr. Tutty recommended that the mother engage in AA/NA meetings (2-3 per week) and obtain a sponsor for daily support Dr. Tutty recommended that the mother complete 8-10 sessions with a Department approved counselor skilled in treatment of ADHD and

borderline personality traits and that cognitive behavioral therapy was recommended. Dr. Tutty recommended regular supervised visitation and that the mother complete a parenting class akin to Incredible Year. Dr. Tutty recommended that the mother complete the services in the next six months and that she saw adequate progress in the parental risk factors.

2.8.6 The Department social worker referred the mother to Sound Mental Health for mental health counseling. Dr. Steve Tutty recommended that the mother complete 8-10 sessions with a Department approved counselor skilled in treatment of ADHD and borderline personality traits and that cognitive behavioral therapy was recommended. The Department Social worker requested that the mother contact her to discuss this recommendation and find a provider for this service. The mother did not cooperate to contact Ms. Kegel to locate a provider for this service.

2.8.7 The Department social worker sent bus tickets and an ORCA card to the mother. The Department social worker invited the mother to shared planning meetings and to family team decision making meetings. The mother was referred to services by letter. The Department social worker reminded the mother of court hearings. The Department social worker Jill Kegel attempted to reach mother by phone and email several times during the time she has been assigned to the case.

2.8.8 The mother understood that she needed to consistently engage in the services offered by the Department to reunify with her daughter. She acknowledged during testimony at trial that she did not complete outpatient treatment or mental health treatment.

2.8.9 Mother participated in DV support services through her teen parenting class and was provided resources for victims of domestic violence.

2.8.10 The Department referred the mother to Parzival Popof for Project Safecare in September 2013. The mother missed appointments with Mr. Popof for this service. Because the mother indicated she liked Mr. Popof and appeared to have a good working relationship with him, the Social Worker Jill Kegel referred the mother again to Mr. Popof for Family Preservation Services. The goals of FPS included assisting mother to obtain housing, to achieve sobriety, and to work on communication due to emotional outbursts. The mother missed appointments with Mr. Popof. The mother did not make progress on achieving sobriety or on achieving

communication. Mr. Popof met with the mother in several locations for Project Safecare and for FPS. Mr. Popof encouraged the mother *to* engage in outpatient treatment tor marijuana dependence and to engage in mental health counseling. Mr. Popof believes that the mother continued to engage in other activities that interfered with her progress. For example, the mother engaged in a fight with another peer and the fight preoccupied the mother's mind. The mother chose to hang out with friends who were not a good influence on her. Mr. Popof made several attempts to assist the mother to find housing after she received a FUP voucher in August 2014. Mr. Popof helped the mother set deadlines and goals and assisted her in setting steps to achieve her goals. Mr. Popof "held the mother's hand" to help her find housing. Mr. Popof believes the mother needs to engage in outpatient and in mental health counseling.

2.8.11 The child was returned to the mother and the father's care in July 2014. The mother did not comply with the conditions of the in home placement. The mother agreed she would do outpatient treatment but she failed to engage in outpatient treatment. The mother did not consistently engage in random urinalysis during the time the child was returned home. The mother did not ensure the child was taken to day care at Childhaven even with the assistance of bus transportation to and from Childhaven. The mother left the child in the maternal grandmother's care in violation of the safety plan. The mother and the father were living in a hotel room at the time. The child was removed from the parents' care three weeks after return home in July 2014. On the date of the second removal, the hotel room contained beer cans and smelled strongly of marijuana.

2.9   There is little likelihood that conditions will be remedied so that the child can be returned to the mother in the near future.

2.9.1 The mother has been referred to a number of services to remedy her parental deficiencies. Despite numerous referrals by the Department and other agencies, the mother did not consistently engage in random urinalysis or drug and alcohol treatment. The mother did not enroll in outpatient treatment. The mother does not believe she has drug or alcohol dependence. The mother disagrees with the initial reasons for removal and does not believe there was a safety concern that justified the initial removal in October 2013. The mother trusts only Parzival Popof and does not trust most other providers or the Department social workers.  The mother believes she should be able to use marijuana and alcohol because it is legal. The mother continues to make poor and unsafe decisions for herself and for the child. The mother blacked out due to alcohol abuse and

as a result, missed one of her appointments scheduled with Dr. Steve Tutty for the psychological evaluation. The child was transported for the appointment and the mother failed to appear. The mother also chose to have a party at her home in January 2015 with individuals drinking alcohol even though the mother was underage at the time and risked losing her housing. The father was invited to the party. Following an incident that occurred at the party, a no contact order was entered between the father and the mother. The mother emotionally shuts down and declines to engage in services when she encounters providers or other professionals who disagree with her. The mother has not consistently visited the child despite numerous visitation referrals and providers, numerous visitation locations in the community, visits in the home, and visits supervised by the foster parent. The mother has not made a behavior change and she continues to make unsafe decisions for herself. Because the mother did not make progress to address her substance abuse issues or her mental health issues, her substance abuse/mental health issues continue to place the child at risk for neglect in her care. The mother's inability to *keep* her life stable and meet her own basic needs place the child at risk. The mother has had approximately twenty months to show progress in her services and she has failed to do so. The mother stated in testimony that she was ready to start services, but starting services the day of the termination trial is insufficient.

2.9.2 The child is young and cannot wait any longer for the mother to become available to safely parent the child. The child needs permanency now. Near future for this child is now. It has already been approximately twenty months. If the child remains in the dependency for several more weeks waiting for the mother to remedy her deficiencies, it will be detrimental to the child.

2.10   Continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. The permanent plan for the child is adoption. An adoptive home is the stable and permanent home for the child.   Other permanent plans are not appropriate for this child because he is a young child. The mother has not shown that she is able to maintain her own life in a stable way. Adoption ensures that the mother's instability in managing her own life will no longer impact the child's welfare. The child is placed in a home that is approved for adoption. There is no other petition before the Court except termination. If the mother's rights remain intact, the child cannot be adopted. Severing the legal relationship with the child and her mother will ensure the child will be integrated into a stable and permanent home. The child has prospects for adoption.

2.11   The mother remains currently unfit to parent the child. She has not engaged consistently in services in the last several months and the status of her engagement remains none at this time.

2.12   The CASA Sharon Doak believes that the parental rights of the parents should be terminated and that termination is in the child's best interests. The mother continues to show an inability to manage her own needs. If she cannot consistently keep her own life stable and safe, she is unable to keep the child safe on a full time basis. The CASA also recommended against giving the mother additional time to initiate services, agreeing with Dr. Tutty's recommendation that there would need to be 6-9 months of sobriety before reunification should be considered, because that would be too long for [the child] to wait for permanency. The child needs stability and permanence that will be secured only through termination of parental rights.

### III. Conclusions of Law

. . . .

3.2   Termination of the parent-child relationship between the above-named minor child, [J.M.,] and the mother, Cay[S]ea McBride, is in the child's best interest.

3.3   The foregoing findings of fact and the allegations of RCW 13.34.180 and .190 have been proven by clear, cogent and convincing evidence unless otherwise noted.[36]

Caysea appeals.

### ANALYSIS

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate parental rights, the State must satisfy a two-step test. First, it must prove the following statutory elements by clear, cogent, and convincing evidence:[37]

(a) That the child has been found to be a dependent child;

---

[36] CP at 230-34 (emphasis added) (boldface and citations omitted).
[37] "'Clear, cogent and convincing' means highly probable.'" In re Welfare of M.R.H., 145 Wn. App. 10, 24, 188 P.3d 510 (2008) (quoting In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995)).

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ; and

(f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.[38]

If the trial court finds that the State has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(1)(b). On review, unchallenged findings of fact are considered verities. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001). Challenged findings will be upheld "[i]f there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

---

[38] RCW 13.34.180(1).

Findings of Fact

Caysea contends finding of fact 2.8 is not supported by substantial evidence from which a trier of fact could find the facts by clear, cogent, and convincing evidence.

Finding of fact 2.8 states:

> Services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.[39]

Pointing to portions of her testimony and language in the dispositional order, Caysea contends the Department failed to prove by clear and convincing evidence that services were *expressly and understandably* offered. Specifically, she contends "she did not understand . . . that she was required to complete an individual counseling regime, notwithstanding the recommendations of some of the service providers, because specific limitations and objections had been placed in the counseling portions of the dispositional order."[40]

But as the Department observes, the limitations and objections noted in the disposition order made it clear that CaySea would have to complete any mental health counseling recommended following the psychological evaluation. The order clearly stated that "*parent agrees to [individual mental health counseling] if recommended by psych. eval.* otherwise contested and *not required* until resolved by court."[41] It is undisputed that Dr. Tutty performed a psychological evaluation and "recommended that

---

[39] CP at 230.
[40] Appellant's Br. at 12.
[41] Ex. 3, p.7 (emphasis added).

the mother complete 8-10 sessions with a Department approved counselor skilled in treatment of ADHD and borderline personality traits and that cognitive behavioral therapy was recommended."[42] CaySea signed an addendum to the order, acknowledging in part that "I have read or been told the contents of this Agreed Order of Dependency and Disposition. . . . I understand the terms of the order being entered, including my responsibility to participate in remedial services as provided in the dispositional order."[43]

CaySea also claims she was confused by service letters that referred to Dr. Tutty's treatment recommendations as court ordered services. But as previously noted, the disposition order plainly required any counseling recommended by Dr. Tutty. Thus, his counseling recommendation was a court-ordered service and service letters referring to it as such were correct. Jill Kegel testified that she discussed the individual counseling requirement "many times" with CaySea.[44] Furthermore, CaySea conceded below, and the court noted in its oral ruling, that she did not seek clarification of her alleged confusion. Thus, the record contains substantial evidence that CaySea's claimed confusion was not justified and/or not credible.

CaySea also challenges the court's finding that she "did not complete a mental health assessment" recommended by Sound Mental Health.[45] She contends Dr. Tutty's evaluation satisfied this requirement. The disposition order required CaySea to obtain a "Drug and Alcohol Evaluation and follow drug and alcohol treatment related

---

[42] CP at 231 (FF 2.8.5).
[43] Ex. 3, p.11.
[44] 2 RP at 275.
[45] CP at 231 (FF 2.8.3).

18

recommendations."[46] Sound Mental Health performed the drug and alcohol evaluation and recommended, in part, that CaySea obtain a mental health assessment. CaySea subsequently engaged in a psychological evaluation with Dr. Tutty. The Department concedes that a mental health assessment "occurred when [CaySea] participated in a psychological evaluation."[47] Accordingly, the words "and did not complete a mental health assessment" must be stricken from finding of fact 2.8.3.

CaySea next contends the finding that she "understood that she needed to consistently engage in services"[48] is not supported by substantial evidence and must be stricken from finding of fact 2.8.8. We disagree. In addition to her signed confirmation that she understood her "responsibility to participate in remedial services as provided in the dispositional order,"[49] the record contains numerous service letters with the following warning:

> It is important that you understand that failure to participate *and complete* the above service plan may result in your rights as a parent being terminated. . . . It is imperative that you become involved in these services as soon as possible.[50]

Parzival Popof testified that "the mother stated that she was generally aware of the consequences of her actions, but . . . just couldn't bring herself to do it" and had "a stubbornness about submitting to the requests of the service team."[51] Jill Kegel testified that when CaySea was not fully participating in services, she told her "that's not quite how

---

[46] CP at 230 (FF 2.8.1(a)).
[47] Resp't Br. at 2 n.2.
[48] Ex. 3, p.11.
[49] Ex 3, p.11.
[50] Exs. 43, 46, 54, 57, 59, 64 (emphasis added).
[51] 2 RP at 333-34.

19

it works. We still have to continue; we still have to *finish* our services."[52] The court's finding is supported by substantial evidence.

CaySea also claims that because she "had a job and appropriate housing, completed parenting related services, chemical dependency and psychological evaluations and was ready to engage in treatment, findings that she was not ready to parent should be stricken."[53] In particular, she contends the court's finding that her "inability to keep her life stable and meet her own basic needs place the child at risk" is contrary to the evidence that she had appropriate housing and a job.[54] She maintains that "isolated incidents in which [she] may have acted in some other manner were unrelated to her parenting and do not support the trial court's broad and cynical conclusions that she placed J.M. at risk."[55] For similar reasons, she contends finding of fact 2.11 must be stricken to the extent it provides that "[t]he mother remains currently unfit to parent the child."[56]

These contentions ignore a crucial portion of finding of fact 2.9.1, which states:

> Because the mother did not make progress to address her substance abuse issues or her mental health issues, her substance abuse/mental health issues continue to place the child at risk for neglect in her care.[57]

It is undisputed that CaySea never completed the required 90 days of clean UAs, that she violated the safety plan, that Dr. Tutty concluded she presented a moderate safety risk due in part to her continued substance abuse and criminal history, and that Kegel believed

---

[52] 3 RP at 463 (emphasis added).
[53] Appellant's Br. at 15 (emphasis omitted).
[54] CP at 232-33 (FF 2.9.1).
[55] Appellant's Br. at 16.
[56] CP at 233.
[57] 2 RP at 271.

her sudden angry outbursts demonstrated a safety risk given the inevitable irritations created by a young child. Kegel testified that after J.M.'s second removal, "it was determined that . . . the mother . . . held a safety risk at that point to the child and . . . has not to this point remedied that. So the visits have remained . . . supervised since that point."[58] Kegel noted that the safety risk was due in part to CaySea

> [l]eaving [J.M.] with the maternal grandmother who is unstable and has mental health issues, and she was court-ordered not to leave her with [and] using [marijuana] while [J.M.] was in her care. . . . [S]afety concerns of not following the safety plan as it was, like, not getting her to Childhaven and ensuring that she was where she needed to be on a daily basis as agreed.
> . . . .
>
> She's not complying with her service plan. She's not doing outpatient treatment. She's not engaged in individual counseling. She's denying that she has any parental deficiencies to begin with, which to me, that right there is a huge risk.
> . . .
> And, just her emotional outbursts. . . . You know. . . there's just a multitude . . . of things that have gone on, and she hasn't been consistent or stable in the child's life, and that right there . . . is a risk to this child.[59]

The challenged findings are supported by sufficient evidence.

<u>Conclusions of Law / Services Expressly and Understandably Offered or Provided</u>

CaySea next contends that the court's findings do not support its legal conclusion that services were expressly and understandably offered. She asserts that after striking the unsupported finding, the remaining findings do not support either that conclusion or the other statutory prerequisites to termination by the required clear, cogent, and convincing evidence. We disagree. The unsupported portion of finding 2.8.3 was just one of many parental deficiencies identified by the court. It was not material to the court's

---

[58] 2 RP at 271.
[59] 3 RP at 491-92.

21

decision. The court's remaining findings and the virtually unanimous conclusion of the witnesses who worked most closely with CaySea provide clear, cogent, and convincing support for the court's conclusions and the statutory termination criteria.

<u>Conclusions of Law / Best Interests of the Child</u>

Last, CaySea contends the Department did not carry its burden under RCW 13.34.190 of proving by a preponderance of the evidence that termination was in J.M.'s best interest. <u>Welfare of S.V.B.</u>, 75 Wn. App. 762, 775-76, 880 P.2d 80 (1994) (best interest element must be proven by a preponderance of the evidence). Pointing to her secure housing and employment, her progress with some services, and her professed readiness at trial to remain sober and complete all other services, she argues that "the equities weigh strongly against terminating the parent-child relationship."[60] The record is to the contrary.

Despite her laudable progress in several areas, CaySea failed during 20 months of services to make progress in several critical areas, including substance abuse and mental health counseling. And as the trial court correctly noted, "starting services the day of the termination trial is insufficient."[61] Further, unchallenged findings established the following:

> 2.9.2 The child is young and cannot wait any longer for the mother to become available to safely parent the child. The child needs permanency now. Near future for this child is now. It has already been approximately twenty months. If the child remains in the dependency . . . waiting for the mother to remedy her deficiencies, it will be detrimental to the child.

---

[60] Appellant's Br. at 25.
[61] CP at 232-33 (FF 2.9.1).

2.10 Continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. The permanent plan for the child is adoption. An adoptive home is the stable and permanent home for the child. Other permanent plans are not appropriate for this child because he is a young child. The mother has not shown that she is able to maintain her own life in a stable way. Adoption ensures that the mother's instability in managing her own life will no longer impact the child's welfare. The child is placed in a home that is approved for adoption. There is no other petition before the Court except termination. If the mother's rights remain intact, the child cannot be adopted. Severing the legal relationship with the child and her mother will ensure the child will be integrated into a stable and permanent home. The child has prospects for adoption.

. . . .

2.12 The CASA Sharon Doak believes that the parental rights of the parents should be terminated and that termination is in the child's best interests. The mother continues to show an inability to manage her own needs. If she cannot consistently keep her own life stable and safe, she is unable to keep the child safe on a full time basis. The CASA also recommended against giving the mother additional time to initiate services, agreeing with Dr. Tutty's recommendation that there would need to be 6-9 months of sobriety before reunification should be considered, because that would be too long for [J.M.] to wait for permanency. The child needs stability and permanence that will be secured only through termination of parental rights.[62]

Even though the words "and did not complete a mental health assessment" from findings of fact 2.8.3 are stricken, the State carried its burden.

Affirmed.

_Trickey, J_

WE CONCUR:

_Cox, J._

---
[62] CP at 233-34.