[No. 16320-9-II.    Division Two.    September 20, 1994.]

*In the Matter of the Welfare of* S.V.B., ET AL.

---

*E. Allen Walker* and *Walker Bradshaw, P.S.,* for appellant.

*Christine O. Gregoire, Attorney General,* and *Kirsten H. Prud'homme, Assistant,* for respondent.

SEINFELD, J. — Appellant, father of I, J, and S,[1] appeals the termination of his parental relationship with his three children. We reverse in part and affirm in part.

## FACTS

Appellant and RB are the father and mother of the three children who are the subject of this action: I, born June 28, 1985; J, born March 26, 1987; and S, born May 12, 1988. However, Appellant did not obtain and file an Adjudication of Paternity until less than 2 weeks before the hearing that resulted in the order at issue here. Further, RB and Appellant were never married; the children's birth certificates do not identify a father; RB was married to another man until sometime in 1987; and the State was aware of at least one additional putative father.

During 1987 and 1988, the State placed the children in protective custody several times, first because RB was in jail and later because of reports of abuse, drug use, and neglect. On December 20, 1988, RB consented to the entry of dependency orders for the three children. The dependency petition for I names Appellant as a potential father; the petitions for J and S declare the father to be unknown. Although the

---

[1]In order to protect the anonymity of the dependent children involved in this case, we do not use either the names of the children or the names of their parents.

State did not make Appellant a party to the dependency proceedings or provide him formal notice of the dependency review hearings, several dependency review orders stated that Appellant should establish paternity so that he might receive services and be considered "a resource" for the children.

The children were in foster care for most of the more than 3-year period of dependency. During this time state social workers were in contact with Appellant and frequently advised him to establish legal paternity. Finally, in November 1989, Appellant signed an acknowledgment of paternity as to I and J, which he gave to a social worker. Although RB had earlier indicated to the social worker that Appellant was the father of I and J, she did not sign an acknowledgment of paternity. After Appellant signed the acknowledgment, the social worker explained to him:

> these were just statements and we still needed to have a legal order of paternity and that a lawyer would need to be contacted in order to do that, that was not something I can do for him.

State social workers had received reports that Appellant in the past had physically abused RB and that he had a drug and alcohol problem. In addition, Appellant had been convicted of fourth degree assault; claimed to have been the children's caretaker at a time when the State discovered them living in unhealthy and filthy conditions; and had an unstable work history. Thus, according to the testimony of the social workers, they were prepared to recommend anger management classes, parenting classes, and drug and alcohol services at such time as Appellant established paternity.

In July 1991, the State filed petitions seeking to terminate the parent-child relationship between the three children and RB; "John Doe, natural father"; and "[Appellant], putative father". In the petitions, the State declared that adoption was in each child's best interest and that continuing the parent-child relationship would diminish the chances of integrating each child into a stable and permanent home. The State also

alleged that it had offered all reasonably available services necessary to correct parental deficiencies.

The State gave Appellant notice of the termination proceeding, and he attended the initial hearing in August 1991. At that hearing, the juvenile court apparently ordered him to establish paternity by October 30, 1991. When Appellant failed to comply, the juvenile court apparently ordered him to do so by November 27, and then continued the case several more times.

It was not until March 12, 1992, that Appellant obtained a judicial determination of paternity. The order was filed on March 20, 1992, and Appellant provided the State with a copy of the paternity order on March 26, 1992, the first day of the termination hearing.

Also on the first day of trial, RB voluntarily relinquished her parental relationship with S and J. The State apparently concurred with RB's earlier request that the court create a guardianship for I, with RB's mother as the appointed guardian. The State then advised the juvenile court that at that time it was seeking to terminate only Appellant's parental relationship, not RB's.

At the hearing, a social worker testified that the children continued to display anger and confusion because of their unstable situation, and that the children's behavior would deteriorate unless they were integrated into stable and permanent homes. Because of this, and because of Appellant's suspected substance and anger problems, the social worker believed termination to be in the children's best interests.

At the close of the evidence, Appellant moved the court to establish a guardianship for I as an alternative to termination, and to appoint the same maternal grandmother as I's guardian. The juvenile court denied the motion without reaching the merits. It advised Appellant that he should have petitioned or counterpetitioned for a guardianship when the State petitioned for termination.

Before closing argument, the juvenile court called for the guardian ad litem's report. Appellant objected "to any purported evidence being argued at this time". The juvenile

court noted the objection, but told Appellant that it had appointed the guardian and wanted to hear his report. The guardian reported that he had no contact with Appellant until the State filed the termination petition, that S and J did not know Appellant, and that the children needed permanence which could only be achieved by termination. The juvenile court granted the State's petition and terminated Appellant's parental relationship with all three children. .

The juvenile court found that: (1) the State had offered Appellant all reasonably available services, but that services were available to Appellant only if he established paternity; (2) there was little likelihood that Appellant would remedy the deficiencies; (3) Appellant had "absolutely no relationship with" S and had only a "quite superficial and quite marginal" relationship with I and J; (4) continuing the parent-child relationship would clearly diminish prospects for integration of the children into stable and permanent homes; and (5) termination was in the best interests of each child.

On appeal, Appellant challenges the admission of the guardian ad litem report and contends generally that the evidence was insufficient to support termination.

## GUARDIAN AD LITEMS REPORT

Appellant claims that the juvenile court erred in allowing the guardian ad litem to give his oral report while not under oath, and after the close of evidence. He claims that the report contained inadmissible evidence and that he did not have the opportunity to cross-examine its author. However, at trial, Appellant's counsel simply objected to "any purported evidence being argued at this time". Appellant did not seek to cross-examine the guardian or complain that the guardian was not under oath.

The law provides for the appointment of a guardian ad litem and for a report from the guardian to the court. Former RCW 13.34.100; *see* RCW 13.34.105. Clearly, it also permits the juvenile court to consider the guardian's report. There is no requirement that the guardian make his report

under oath. However, if Appellant had desired to call the guardian as a witness, he could have done so. Then it would have been appropriate for the court to administer the oath. The trial court did not err in considering the report of the guardian ad litem.

## TERMINATION FINDINGS

In a termination case, statute requires the State to prove the allegations listed at RCW 13.34.180(1)-(6) by "clear, cogent, and convincing evidence". RCW 13.34.190(1). The juvenile court found that the State had met its burden of proof. However, Appellant claims that the evidence was not sufficient to support the court's findings regarding statutory allegations (4) through (6).

Former RCW 13.34.180(4)-(6) provides:

> (4) That the services ordered under RCW 13.34.130 have been offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided; and
>
> (5) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; and
>
> (6) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home . . ..

Former RCW 13.34.180 (Laws of 1990, ch. 246, § 7, p. 1341).[2] Appellant also challenges the juvenile court's finding, required by RCW 13.34.190(4), that termination was in the best interests of the children.

■■ We must affirm the juvenile court if substantial evidence supports its findings, that is, if the State met its burden of production. *In re Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973); *In re Dependency of C.B.*, 61 Wn. App. 280, 283 n.2, 286, 810 P.2d 518 (1991). The State satisfies this burden by producing sufficient evidence for a rational trier of fact to find the necessary facts to the required level of certainty. *See C.B.*, 61 Wn. App. at 285-86.

---

[2]In 1993, the Legislature amended subsection (5) to provide guiding examples. Laws of 1993, ch. 412, § 2, p. 1638.

# A
## Factor 4 — State-Offered Services

The juvenile court's findings of fact 8 and 9 address statutory factor 4. The court found as follows:

██ The natural father has failed to effectively avail himself of the services ordered pursuant to the aforesaid dependency orders. During the entire time period relevant to these proceedings, the aforementioned services were available if the natural father had chosen to avail himself of such services. [Appellant] failed to establish legal paternity in a timely manner despite being advised by social workers on numerous occasions of the need to do so.

██ All services reasonably available, capable of correcting the parental deficiencies within the foreseeable future, have been offered and were at all times available to [Appellant] if he had chosen to pursue them. [Appellant] simply declined to avail himself of services.

The State must offer certain services to the *parents* of dependent children in an attempt to remedy the conditions that led to the dependency. RCW 13.34.130(3)(b), (5)(b). It must also encourage maximum parent-child contact through visitation and participation in care. RCW 13.34.130(3)(b)(ii), (5)(b)(vi).

A person is a "parent", as RCW 13.34 uses that term, if he or she is "the biological or adoptive" parent, "unless the legal rights of that person have been terminated by judicial proceedings". RCW 13.04.011(4). Here, Appellant is the biological parent of I, J, and S.

However, Appellant's relationship to the children during the dependency period was unclear. He was not named as the father on their birth certificates and had not obtained a court determination of paternity. Thus the State, uncertain of Appellant's paternal relationship to I, J, and S, appropriately conditioned its offer of remedial services on Appellant legally establishing his paternity.[3] Nonetheless, to prevail on

---

[3]We recognize that the State's limited financial and human resources may best be spent serving those whose relationship to the dependent child is not in doubt. A mere putative parent might initially claim parental rights but later decline to accept legal responsibility as a parent. This suggests a need for caution before developing a bond between the child and one who is not a legal parent, and who might change his mind about accepting parental obligations.

its termination petition, the State was required to meet its statutory burden of proof pursuant to RCW 13.34.180(4).

To comply with that statute, the State was required to show either that: (1) it offered Appellant the required remedial services and Appellant failed to avail himself of those services; or (2) Appellant, by words, conduct or both, waived his right to such services. The State contends that Appellant waived his right to such services, and we agree.

██ "Waiver . . . requires intentional relinquishment or abandonment of a known right or privilege." *State v. Edwards*, 93 Wn.2d 162, 168, 606 P.2d 1224 (1980). Waiver is a voluntary act, *PUD 1 v. WPPSS*, 104 Wn.2d 353, 365, 705 P.2d 1195, 713 P.2d 1109 (1985), but conduct supporting an inference of relinquishment by choice can imply waiver. *PUD 1*, 104 Wn.2d at 365.

Proof of implied waiver requires proof of "unequivocal acts or conduct evincing an intent to waive"; the claimed act of waiver must be inconsistent with any other intent as intent will not be inferred from "doubtful or ambiguous factors". *Wagner v. Wagner*, 95 Wn.2d 94, 102, 621 P.2d 1279 (1980). Further, the person against whom waiver is asserted must have understood that the consequences of his or her actions would be relinquishment of the right. *See McDaniels v. Carlson*, 108 Wn.2d 299, 308, 738 P.2d 254 (1987).

██ Thus, to establish waiver here, the State needed to demonstrate that: (1) Appellant knew that he had a statutory right to receive remedial services; (2) Appellant acted in such a way as to evince, in an unequivocal way, his intention to give up this right; (3) Appellant had the means and opportunity to exercise his rights; and (4) Appellant understood that the consequences of his actions would be that the State would not provide services to him.

### 1. Knowledge of Right.

Appellant knew that I, J, and S were dependents of the State from the beginning of the dependency, in December 1988. Even before that, state social workers had advised his mother and RB that placement with Appellant or his family depended on Appellant establishing legal paternity.

On June 12, 1989, state social worker Joanne Ashcraft explained to Appellant that he needed to obtain an adjudication of paternity and that he could not be involved in the dependency until he did so. She told Appellant what a putative father was and told him how to go about establishing paternity by contacting the prosecutor's office, by contacting the support enforcement office, or by contacting a private attorney. Appellant was present when Ashcraft reviewed with RB a recommendation for the next day's review hearing; at that hearing, the court ordered Appellant to establish paternity so that a service plan could be designed for him.

In August 1989, Appellant called Ashcraft saying that he wanted to establish paternity and gain custody; Ashcraft again explained how to do so. Ashcraft provided an acknowledgment of paternity form, and Appellant signed it on November 3, 1989. Ashcraft then explained that Appellant still needed an order of paternity obtained with the assistance of a lawyer. At trial, Appellant admitted that social workers told him to work through the prosecutor's office to obtain blood tests and to establish paternity *after* he signed the acknowledgment.

In June of 1990, Appellant contacted Ken Panitz, the social worker then assigned to the case. Panitz reminded him that he needed to establish paternity; Appellant told Panitz he was working on obtaining a paternity order.

In June 1991, the then current social worker, Judith Keyser, again told Appellant that the State would treat him as a parent and provide services to him only if he established legal paternity.

This evidence is sufficient to establish Appellant's knowledge of his right to receive those services statutorily mandated to correct parental deficiencies. It further is sufficient to show that Appellant knew that the State conditioned the provision of services on his establishment of legal paternity.

### 2. Acts Evincing Intention To Give up Right.

Despite the State's repeated encouragement over a prolonged period of time, Appellant failed to take the necessary steps to establish his paternity during the dependency per-

iod. Although he offered assurances that he was "working on it", his actions were inconsistent with his words. The record reflects that the first step he took to establish paternity was to make an appointment for sometime in September 1990 with the Pierce County Prosecutor's office. However, as Appellant acknowledged at trial, he failed to keep this appointment. He did not actually make and keep a second appointment with the prosecutor until after the State filed the termination petition in the summer of 1991. Not until the eve of the termination hearing, when it was too late to avail himself of remedial services, did Appellant act on the State's advice.

The trial court did not err in inferring from Appellant's pattern of inactivity over an extended period of time that "[Appellant] declined to avail himself of services." Assuming that Appellant had the means to act and understood the consequences of failing to do so, it is reasonable to conclude that this inactivity evinced an intent to waive his right to receive remedial services.

### 3. Means and Opportunity To Exercise Rights.

Viewed in isolation, we might see Appellant's pattern of inactivity as equivocal and ambiguous evidence of his intention to abandon his right to receive state services. In other words, the inactivity is susceptible of other interpretations unless Appellant had the knowledge and means to establish his legal parental status. Here, the evidence is clear that the State provided Appellant the information and the means to proceed.

As early as June 1989, social worker Ashcraft explained to Appellant that the support enforcement office or the prosecutor's office would aid him in establishing paternity. She again explained this to him in August 1989 and in November 1989. Appellant's understanding of the necessary step is shown by the fact that he went so far as to make an appointment with the prosecutor's office for September 1990. This was a year and a half before the termination hearing. Still again, in June 1991, social worker Keyser explained to Appel-

lant how to proceed. Appellant told Keyser he was working on establishing paternity.

This evidence is inconsistent with Appellant's belated trial protestations that he misunderstood that he needed to do more than sign an affidavit of paternity. The evidence is sufficient to show that Appellant knew the process to obtain a paternity order and knew that the local prosecutor's office would handle this for him. Given this knowledge, his failure over several years to actually obtain the necessary order of paternity is unequivocal and inconsistent with any intent other than the abandonment of his statutory right to be treated as a parent and to receive parental services.

4. Knowledge of Consequences of Inaction.

Clear, cogent and convincing evidence also supports the inference that Appellant knew the consequences of failing to establish his parental status. Social workers repeatedly advised Appellant that the State had no statutory duty to provide services to him until he established his legal paternity. Appellant does not dispute this. The evidence is sufficient to show that Appellant intentionally abandoned his known right to receive those services mandated by statute. RCW 13.34.180-.190. Thus, he may not now predicate error on the basis of insufficient evidence to support the trial court's findings of fact 8 and 9 regarding such services. *See* *McDaniels*, 108 Wn.2d at 308.

### B

Factor 5 — Little Likelihood of Remedying Conditions

Clear, cogent, and convincing evidence also supports the trial court's finding of fact 10 relating to statutory factor (5), RCW 13.34.180(5). In finding of fact 10, the court found:

> There is little likelihood that conditions will be remedied so that the [children] can be returned to the natural father in the near future. Based on his four year history, the court sees no assurance that [Appellant] will follow through with court ordered services in the near future.

Proof of statutory factor (5) requires a showing that, at the time of the termination hearing, there were parental deficiencies that Appellant was unlikely to cure in the near

future; that is, proof of then present parental unfitness. *Krause v. Catholic Comm'ty Servs.*, 47 Wn. App. 734, 742-43, 737 P.2d 280, *review denied*, 108 Wn.2d 1035 (1987); *accord In re H.J.P.*, 114 Wn.2d 522, 530, 789 P.2d 96 (1990). The evidence presented at trial was sufficient for the trial court to infer the continuation of Appellant's parental deficiencies.

First, there was evidence that Appellant did not recognize or was not capable of meeting the needs of the children. At one point, the State removed the children from their home because they were living in squalor, and were abused and neglected. Appellant admitted that he was the primary caretaker at that time, but he viewed the environment as clean, stable, and adequate. Second, RB testified that she had witnessed Appellant using illegal drugs as recently as 2 months before the termination hearing, although Appellant claimed to have discontinued using drugs a year before the hearing. Third, RB testified that Appellant continued to abuse alcohol at the time of the termination hearing, although Appellant denied having a drug or alcohol problem.

Further, Appellant had been convicted of assault and, according to the testimony, beat RB. However, he failed to complete court-ordered anger management classes and denied needing help with anger management. Nor had Appellant shown any signs of stability; he has not maintained a steady job or residence and at the termination hearing, he initially testified he was again unemployed. (He later claimed to be working part time at his mother's restaurant.)

The trial court could also infer from Appellant's testimony that Appellant considered the children to be almost entirely RB's responsibility. He blamed RB for the loss of the children and refused to accept his own parental duties. His lack of responsibility was shown by his testimony that he did not establish paternity or seek involvement in the dependency until the State began termination proceedings because he expected RB to overcome her own difficulties and regain the children.

In addition, Appellant made little effort to have any contact with the children during the dependency. He did not

know the birthdays of S or J, and in fact barely knew those two children, and they hardly knew him. The trial court did not err in finding "little likelihood that conditions will be remedied so that the [children] can be returned to the natural father in the near future".

## C
### Factor 6 — Continuation of Relationship

In finding of fact 13, the juvenile court found that "[c]ontinuance of the parent-child relationship clearly diminishes the child's prospect for integration into a stable and permanent home." The evidence is sufficient to support this finding insofar as it related to J and S. However, the evidence is insufficient on this point to prove factor (6), RCW 13.34.180, with regard to I.

The juvenile court learned of the desperate need of all three children for permanence, without further delay. It found that the continuation of the children's indefinite status would frustrate state efforts to find permanent placements for them. However, in I's case, Appellant's parental rights are not interfering with I's integration into a permanent home. I is living with his paternal grandmother pursuant to the court-established guardianship. The termination of Appellant's paternal relationship with him will not cause this arrangement to change. Termination will merely deprive I of the benefits of a parent — the potential for nurturing support and the financial support that the law would otherwise obligate Appellant to provide. Because the State failed to prove RCW 13.34.180(6) by clear, cogent and convincing evidence with regard to I, we conclude that the juvenile court erred in ordering termination of Appellant's parental relationship to I.

## D
### Termination in Best Interests of the Children

Finally, the State presented sufficient evidence to establish that orders of termination were in the best interests of S and J. RCW 13.34.190(4); *see In re Dependency of A.V.D.*, 62 Wn. App. 562, 815 P.2d 277 (1991) (a preponder-

ance of the evidence ordinarily sufficient to prove that termination is in best interests of child).

We affirm the order terminating Appellant's parental relationship with J and S. We reverse the order terminating Appellant's parental relationship with I and remand the matter to the juvenile court for such other proceedings as are consistent with this opinion.

MORGAN, C.J., and ALEXANDER, J., concur.

Reconsideration denied December 9, 1994.