# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 74722-3-I |
| | ) | (consolidated with No. |
| A.B. (DOB: 08/18/2011) | ) | 74723-1-I, 74922-6-I, |
| A.H. (DOB: 02/20/2009) | ) | 74921-8-I, and 74920-0-I) |
| E.H. (DOB: 01/19/2008) | ) | |
| T.O. (DOB: 06/09/2006) | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| DEPARTMENT OF HEALTH AND | ) | |
| SOCIAL SERVICES, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MATTIE MACARTHUR and COREY | ) | |
| HUDSON, | ) | |
| | ) | |
| Appellants. | ) | FILED: March 27, 2017 |
| | ) | |

APPELWICK, J. — MacArthur appeals the trial court's order terminating her parental rights to her four children: daughter T.O., son E.H., son A.H. and daughter A.B. MacArthur contends the trial court's failure to appoint counsel for the children or recess the trial due to her illness violated due process. MacArthur also challenges the sufficiency of the evidence and the trial court's failure to

make certain findings. Hudson contends that the trial court's order terminating his parental rights to T.O. was not supported by sufficient evidence and that his due process rights were violated when the trial court failed to consider whether ineffective assistance of counsel prejudiced his ability to participate in the dependency proceedings. We remand for the trial court to make required findings regarding sibling contact. In all other respects, we affirm.

## FACTS

In June 2006, MacArthur gave birth to T.O. MacArthur identified her boyfriend Brandon Ocasio as the father on T.O.'s birth certificate. However, MacArthur was romantically involved with another man, Corey Hudson, at the same time. Shortly after T.O.'s conception, Hudson was charged with violating federal gun laws and sentenced to eight years in prison. When T.O. was approximately six months old, MacArthur took T.O. to visit Hudson in prison. Other than that, Hudson has never met T.O.

E.H. and A.H. were born in January 2008 and February 2009, respectively, during MacArthur's relationship with Lamont Hayes. Hayes was physically abusive to MacArthur and MacArthur ended the relationship.

In 2010, MacArthur began dating Christopher Brown. A.B. was born in August 2011. When A.B. was a few weeks old, Brown punched MacArthur in the face while she was holding A.B. in her arms. Brown was charged with fourth-degree assault and the superior court imposed a no-contact order.

Neither MacArthur nor Brown abided by the terms of the order. In April 2012, MacArthur and Brown were staying at a motel with the children. Brown hit

MacArthur. MacArthur and Brown left together in Brown's car, leaving the children alone at the motel temporarily. Brown was charged with violating the no-contact order.

In June 2012, the Department of Social and Health Services (Department) became involved when MacArthur's oldest son, J.W., reported that MacArthur physically assaulted him. According to J.W., when he took some of his sister's food, MacArthur "twisted his arm, threatened to break his arm, slammed him into a wall, kicked him in the stomach, and hit him in the face." J.W. also reported that MacArthur had allowed Brown to hit him with a belt, and that Brown had physically disciplined the younger children as well. The Department filed a dependency petition.

In October 2012, MacArthur agreed to dependency. The court ordered MacArthur to participate in a parenting assessment, mental health counseling, and counseling for victims of domestic violence. MacArthur acknowledged to Department social worker Jennifer Johnson that her relationship with Brown had posed a risk to her and her children. MacArthur insisted that she was no longer involved with Brown.

In April 2013, Dr. Carmela Washington-Harvey performed a parenting assessment of MacArthur. MacArthur denied ever having assaulted J.W. Dr. Washington-Harvey noted that MacArthur struggled with her mental health, including emotional regulation, and that MacArthur needed help "recognizing risk factors" and "making better life decisions and problem-solving." MacArthur also had scores that were "elevated well above the recommended cutoff" on a child

3

abuse risk inventory, showing that MacArthur exhibited "factors that might make her prone to physically abusing children." Dr. Washington-Harvey recommended that MacArthur continue to participate in mental health treatment and domestic violence support, as well as services such as parent-child interactive therapy (PCIT), family preservation services (FPS), or parenting classes.

In December 2013, MacArthur attempted to modify the no-contact order. MacArthur stated that she was not afraid of Brown and wanted to co-parent A.B. with him. The superior court denied MacArthur's request.

In January 2014, MacArthur's father sought a protection order against Brown. The petition alleged that Brown was living with MacArthur and had repeatedly assaulted both MacArthur and her father.

In February 2014, Johnson learned that MacArthur was pregnant. Though MacArthur initially refused to disclose the identity of the father, she later admitted that it was Brown. MacArthur also admitted that Brown had given her a car, a Ford Explorer, and shared a cell phone plan with her.

In June 2014, MacArthur gave birth to A.M. Brown visited MacArthur at the hospital and was arrested for violating the no-contact order. The Department filed a dependency petition as to A.M.

In November 2014, the Department filed a termination petition as to T.O., E.H., A.H. and A.B.[1] While the termination trial was pending, MacArthur

---

[1] J.W. had been returned to the care of his father and his dependency case had been dismissed. A.M. was not included in the termination petition because she had not been out of the care of a parent for at least six months, as required by RCW 13.34.180(1)(c).

continued to have contact with Brown. In February 2015, Jon Carter, the court appointed special advocate (CASA), visited MacArthur's apartment, where he saw a man's coat and a pair of shoes consistent with a man of Brown's size. MacArthur denied the items belonged to Brown and told Carter that the shoes were in her apartment because she sold shoes. Carter left MacArthur's apartment and continued to observe the apartment from his car. After a few minutes, Carter saw a man "who I subsequently identified as Chris Brown, standing on the balcony looking down at me in my car." In April 2015, Department social worker Charles Loeffler made an unannounced visit to MacArthur's home. MacArthur took a long time to open the front door and refused to allow Loeffler to enter her closed bedroom. Loeffler returned to his car and waited. He saw MacArthur walk out, look around, and walk back inside. He then saw a man resembling Brown leave the apartment, get into the Ford Explorer, and drive away. When Loeffler confronted MacArthur about Brown being in her apartment, MacArthur did not deny it. Instead, MacArthur said, "Yeah, and was [A.M.] here?" According to Loeffler, MacArthur "seemed to be acknowledging that Mr. Brown was present during the first visit, that that is who I had seen, and that it didn't matter because it wasn't during a visit with [A.M.]."

Prior to the termination trial, MacArthur requested the appointment of counsel for all four children.[2] The juvenile court denied the motion.[3]

---

[2] MacArthur initially requested appointment of counsel only for E.H., who was placed in a group home for children with behavioral needs. After the trial court denied the motion, MacArthur requested appointment of counsel for the three remaining children. However, it is clear that the court considered the needs of all four children in ruling on MacArthur's second motion.

Trial on the petition took place between October 26 and November 10, 2015. At the time of trial, T.O. was nine years old, E.H. was seven years old, A.H. was six years old, and A.B. was four years old. The children had been out of MacArthur's care for more than three years. The trial court heard testimony from 22 witnesses and reviewed over a hundred exhibits. On December 18, 2015, the trial court entered findings of fact and conclusions of law and an order terminating MacArthur's and Hudson's parental rights.[4] MacArthur and Hudson appeal.

DISCUSSION

I. <u>Sufficiency of the Evidence</u>

Parental rights are a fundamental liberty interest protected by the United States Constitution. <u>Santosky v. Kramer</u>, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate parental rights, the State must satisfy a two step test. <u>In re Welfare of A.B.</u>, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). First, it must prove each of six statutory elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence:

> (a) That the child has been found to be a dependent child;
>
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

---

[3] The judge who ruled on MacArthur's motion was a different judge than the one that presided at trial.

[4] The parental rights of Brown and Hayes were terminated by separate order and they are not parties to this appeal.

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . . ; [and]

(f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1); RCW 13.34.190(1)(a)(i); A.B., 168 Wn.2d at 911. If the trial court finds that the State has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(1)(b); A.B., 168 Wn.2d at 911.

Findings of fact must be supported by substantial evidence. In re Dependency of D.L.B., 188 Wn. App. 905, 914, 355 P.3d 345 (2015), aff'd, 186 Wn.2d 103, 376 P.3d 1099 (2016). Unchallenged findings of fact are verities on appeal. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001). In determining whether substantial evidence supports the trial court's findings, we will not weigh the evidence or the credibility of witnesses. In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003).

A. Services for MacArthur

MacArthur contends that the Department failed to offer or provide all necessary and reasonably available services to correct her parental deficiencies, as required by RCW 13.34.180(1)(d). A service is "necessary" within the meaning of RCW 13.34.180(1)(d) if it is "needed to address a condition that precludes reunification of the parent and child." In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014). The Department must establish that the services it offers are individually tailored to a parent's specific needs. In re Dependency of D.A., 124 Wn. App. 644, 651 n.11, 102 P.3d 847 (2004). However, if a parent is unwilling or unable to make use of the services offered or provided, the Department is not required to offer additional services that might have been helpful. In re Dependency of S.M.H., 128 Wn. App. 45, 54, 115 P.3d 990 (2005). Furthermore, even where the State inexcusably fails to offer a service to a willing parent, termination is nevertheless appropriate if the service would not have remedied the parent's deficiencies in the foreseeable future. In re Welfare of Hall, 99 Wn.2d 842, 850-51, 664 P.2d 1245 (1983).

Several witnesses testified that MacArthur had difficulty following visitation rules or interacting productively with service providers. For example, during one visit at a Chuck E. Cheese restaurant, MacArthur took A.H. into the bathroom, began asking him about his treatment in his foster home, and she told the visit supervisor to leave. When the visit supervisor reminded MacArthur that she had to be within sight and sound of the children, MacArthur began yelling and the visit supervisor attempted to end the visit. MacArthur refused to return the children or

leave, and the visit supervisor called 911. MacArthur responded by also calling 911, claiming that the supervisor had assaulted her. During another visit, MacArthur served each of the children, including three year old A.B., with a subpoena. When the visit supervisor attempted to take the subpoenas to give to the foster parents, MacArthur read one out loud, instructing the children to "dress nicely . . . because they were going to be going in front of the judge" and "tell the truth and tell the judge that you want to come home to me."

The trial court found, that MacArthur's visits had not progressed beyond supervised because of these concerning behaviors.[5] MacArthur contends that the Department failed to offer her any services, such as a psychological evaluation, to address these behaviors and facilitate reunification.

However, Loeffler testified that the primary barrier to reunification was MacArthur's continued relationship with Brown. He testified that, while other services might have improved the quality of MacArthur's visits, it was "a side issue" and he "did not believe it would do anything to address the parental deficiencies that we were concerned about." The trial court found that MacArthur "has been offered and has participated in a full panoply of services during the past three years, most of which have been ordered to help her improve her mental health and recognize and resolve her pattern of maintaining relationships with abusive partners who put her

_____

[5] The trial court found: "It is notable that Ms. MacArthur still has supervised visitation with her children this far into the dependency. This Court heard testimony about multiple visits where the mother's poor judgment negatively impacted her children even since the filing of the termination petition. At a visit in public in August 2015 the police were called to aide the visit supervisor in enforcing the visitation rules."

9

children and herself at risk." Because MacArthur had not been able to address her primary parental deficiency, additional services to help her work more productively with providers would not have been helpful.

Moreover, the record shows that the Department did, in fact, offer MacArthur the opportunity to participate in a psychological evaluation. Loeffler testified that he suggested a psychological evaluation to MacArthur in September or October 2014, because she was not making progress in her other services. Although MacArthur initially expressed interest, a few months later, she changed her mind and refused to participate. In April 2015, the juvenile court ordered MacArthur to do the psychological evaluation as part of the dispositional order in A.M.'s dependency case. But, when Loeffler tried to schedule an appointment, MacArthur responded by telling Loeffler, "I am going to the police about what you did to me" and threatened to accuse Loeffler of sexual harassment.[6]

MacArthur also claims that the Department should have offered her PCIT or FPS, as recommended by Dr. Washington-Harvey. But, the trial court found that "these services are designed to aid impending reunification and Ms. MacArthur has not approached reunification throughout this lengthy dependency" and that "[t]hese services never became necessary nor could they have remedied her parental deficiencies." Though MacArthur challenges these findings, they were supported by substantial evidence. Even at the time of the termination trial, MacArthur had not progressed beyond having supervised

---

[6] MacArthur ultimately consented to the evaluation, and had an appointment scheduled for the week after the termination trial.

visitation with the children. Johnson testified that FPS was not appropriate until "there is an agreed plan, an identified plan of reunification and children are actually in the route of – in the throes, if you will, of reunifying with their parents." Johnson testified that PCIT was not recommended "unless children are spending a minimum of three to five days with the parent during the course of their visitation." We conclude that neither PCIT nor FPS was a necessary service under the facts of this case.

B. Services for Hudson

Hudson contends the Department failed to prove that it offered or provided all necessary services capable of correcting his parental deficiencies, because it did not timely offer him paternity testing.

After the Department filed the dependency petition for T.O. and her siblings, social worker Lula Smith located Hudson in a federal prison in Colorado. Hudson wrote a letter to Smith stating that he had been "notified of . . . me being the alleged father of [T.O.]" and asking for more information. Smith tried to call the prison several times to talk to Hudson's case manager, but was never able to reach him. Hudson did not write to Smith again.

In December 2012, Hudson filed an answer to the dependency petition, admitting that he was T.O.'s biological father. Hudson agreed to dependency. The dispositional order provided that Hudson was required to participate in a parenting assessment and work to establish a relationship with T.O. "should the father request placement." Regarding visitation, the dispositional order stated, "The specific visitation plan between the children and the father shall be as

11

follows: If the father comes forward and requests placement, a visitation plan in the best interests of the child shall be developed by the Department in consultation with the CASA." The dispositional order did not order or require paternity testing. Hudson signed the order, which stated:

> I have read or been told the contents of this Agreed Order of Dependency and Disposition and I agree that the order is accurate and should be signed by the court. I understand the terms of the order being entered, including my responsibility to participate in remedial services as provided in the dispositional order.

Hudson was released in June 2013. However, he did not contact the Department or otherwise express any interest in a relationship with T.O.

Hudson went back to prison in June 2014 for parole violations. In January 2015, Loeffler was able to locate Hudson in a county jail in Oregon. Loeffler sent Hudson a letter telling him about the termination trial and urging Hudson to contact him. Hudson wrote back stating "there should be no issue whatsoever regarding my paternity of [T.O.]. I am proud to be her father." However, Hudson stated he was "willing to submit to a DNA [(deoxyribonucleic acid)] test to verify paternity if deemed necessary." Hudson requested that T.O. be placed with his family members until he was released from custody, at which time he wanted T.O. to be placed with him. In February 2015, Hudson's attorney filed a motion for paternity testing, and the results established that Hudson was T.O.'s biological father.

Citing In re Welfare of S.V.B., 75 Wn. App. 762, 880 P.2d 80 (1994), Hudson contends that he was not able to fully participate in the dependency proceedings until his paternity was established. But, S.V.B. does not support this

12

assertion. In S.V.B., the court held that the Department could condition the offer of services on the establishment of paternity, but did not hold that the Department was required to do so. Id. at 770. The court also held that the Department was not relieved from its burden to offer services unless the alleged father waived those services by refusing to participate in paternity testing. Id.

Here, the Department did not condition services on Hudson establishing paternity. Rather, the Department assumed from the beginning that Hudson was T.O.'s biological father, because Hudson repeatedly acknowledged that he was.[7] Moreover, Hudson's primary parental deficiency was his physical unavailability, due to his incarceration, and his demonstrated lack of interest in developing a relationship with T.O. The trial court found that "Mr. Hudson is in no position to be a placement. Mr. Hudson asserts that the Department's failure to provide a DNA test earlier than it occurred is fatal to the termination case. However, whether or not DNA was established earlier, Mr. Hudson was still incarcerated for the first eight years of her life." The trial court also found that "[d]uring a one year period when he was not incarcerated, Mr. Hudson made no effort to establish a relationship with [T.O.]." Substantial evidence supports these findings.[8]

---

[7] Hudson also cites RCW 13.04.11(5), which defines "parent" for the purposes of chapter 13.34 RCW as "the biological or adoptive parents of a child." It is undisputed that Hudson asserted that he was T.O.'s biological father.

[8] Hudson also asserts the Department failed to provide him "reasonably competent case management." Hudson contends that the Department frequently did not know where he was and was misinformed about the nature of his crimes, thus believing he would be incarcerated longer than he actually was. But, these alleged failings did not relieve Hudson of the obligations in his dispositional order to contact the

13

C. Likelihood of Reunification

MacArthur contends the trial court erred in finding that there was little likelihood that conditions would be remedied so that the children could be returned in the near future. The focus of RCW 13.34.180(1)(e) is whether a parent's identified deficiencies have been corrected. In re Welfare of M.R.H., 145 Wn. App. 10, 27, 188 P.3d 510 (2008). " 'Even where there is evidence that the parent may eventually be capable of correcting parental deficiencies, termination is still appropriate where deficiencies will not be corrected within the foreseeable future.' " D.L.B, 188 Wn. App. 922-23 (quoting M.R.H., 145 Wn. App. at 27.). Although the law provides no numerical standard to measure the foreseeable future, this determination is a factual inquiry evaluated from "the child's point of view," which varies with the child's age. In re Dependency of A.C., 123 Wn. App. 244, 249, 98 P.3d 89 (2004).

Relying on In re Welfare of C.B., 134 Wn. App. 942, 143 P.3d 846 (2006), MacArthur argues that the court could not rely solely on her past relationship with Brown in making the "little likelihood" finding. We agree that, once a parent shows that "she has been improving" the State may not rely "solely on past performance to prove that it is highly probable that there is little likelihood that the parent will be reunited with her children in the near future." Id. at 953.

Here, in contrast, MacArthur continued to have contact with Brown and continued to refuse to acknowledge the danger he posed to her and her children.

---

Department and request placement before being offered services and visitation.

14

Even at the termination trial, MacArthur testified that she did not believe Brown posed a risk to the children and that she would have no concerns about their safety with him, even if she were not present. And, the trial court found that MacArthur continued to have contact with Brown as recently as April 2015, and continued to deny it to the Department. MacArthur disputes this finding, arguing that she had not seen Brown since the birth of A.M. But, the trial court found:

> The key finding that causes the Court to conclude that there is little likelihood that the children can be returned to Ms. MacArthur in the near future is her own lack of credibility regarding her relationship with Mr. Brown. During her testimony at trial, she contradicted herself repeatedly and was impeached many times. . . . . Ms. MacArthur admitted at trial that she has told "a lot of lies."

We do not weigh the evidence or credibility of witnesses, and we give great deference to the trial court's credibility determinations. The trial court's finding regarding the "little likelihood" evidence was supported by substantial evidence.[9]

D. Parental Unfitness

MacArthur contends that the trial court erred in terminating her parental rights without expressly finding that she was currently unfit to parent the children.

In addition to the statutory prerequisites in RCW 13.34.180(1), the State must also prove that the parent is "currently unfit to parent." In re Parental Rights to B.P., 186 Wn.2d 292, 312-13, 376 P.3d 350 (2016). In order to prove

---

[9] MacArthur challenges a number of the trial court's factual findings related to the "little likelihood element." For example, one of the findings states that the juvenile court found MacArthur "to be making progress on only one occasion – September 2014." MacArthur contends that the juvenile court found she was making at least "partial progress" on other occasions. However, we conclude that the challenged factual findings are not critical to the trial court's ultimate findings and conclusions regarding the RCW 13.34.180(1) elements.

unfitness, the State must show that the parent's deficiencies make him or her incapable of providing " 'basic nurture, health, or safety.' " Id. at 313 (quoting In re Welfare of A.B., 181 Wn. App. 45, 61, 323 P.3d 1062 (2004)). Terminating a parent's rights in the absence of a finding of parental unfitness, either express or implied, violates due process clause protections. Id. "[W]hen an appellate court is faced with a record that omits an explicit finding of current parental unfitness, the appellate court can imply or infer the omitted finding if—but only if—all the facts and circumstances in the record (including but not limited to any boiler plate findings that parrot RCW 13.34.180) clearly demonstrate that the omitted finding was actually intended, and thus made, by the trial court." In re Welfare of A.B., 168 Wn.2d 908, 921, 232 P.3d 1104 (2010).

The trial court in this case made no explicit finding that MacArthur was currently unfit to parent the children. But, it is clear that the trial court intended to find that MacArthur was unfit to parent. The trial court found "that the children would not be protected from Mr. Brown if they were returned to their mother" and that "the children would not be safe with their mother." In doing so, the trial court explicitly found that MacArthur's primary deficiency—her failure to acknowledge the danger Brown presented to her children—made her incapable of keeping her children safe. In addition, the trial court concluded that the Department had established each element of RCW 13.34.180(a) through (f). When trial court finds that the six statutory prerequisites have been met, this provides support for an implicit finding of unfitness. B.P., 186 Wn.2d at 313.

16

MacArthur contends the evidence was insufficient to support the trial court's finding of unfitness. She contends that the State failed to prove that she and Brown were in a relationship at the time of the termination trial. However, as discussed above, the trial court found MacArthur's denial that she continued to be in a relationship with Brown to be not credible.

MacArthur asserts that even if she had contact with Brown, the State failed to prove that she would not protect her children from him. Citing In re Dependency of D.L.B., 186 Wn.2d 103, 124, 376 P.3d 1099 (2016), she contends that "being the victim of domestic violence is not a parental deficiency." But, the trial court did not find that MacArthur was unfit because she was a victim of domestic violence. Rather, the trial court found that MacArthur refused to acknowledge the danger Brown posed to herself and her children. The evidence showed that Brown had whipped J.W. with a belt, and that MacArthur allowed this to happen. Brown also assaulted MacArthur while MacArthur was holding A.B. and drove off in a car with MacArthur, leaving the children alone in a hotel room. MacArthur testified at trial that she did not believe Brown posed a risk to her children. She also stated that she would not be concerned even if Brown sought custody of A.B. and A.M. Finally, several witnesses, including Johnson, Loeffler, and Dr. Washington-Harvey, testified that even witnessing violence against a parent can cause both physical and psychological harm to a child.[10]

---

[10] In her brief, MacArthur challenges the testimony that witnessing domestic violence is harmful, citing various journal articles and the Department's training manual on domestic violence. Because these documents are not part of the record on appeal, nor were they before the trial court, we do not consider them.

Amici curiae Legal Voice and the American Civil Liberties Union (ACLU) filed an amicus brief supporting MacArthur's contention that her status as a domestic violence victim does not constitute a parental deficiency, and highlighting the difficult choices victims face in separating from their abusers.[11] However, citing S.M.H., amici acknowledge that "there are some situations where children are so endangered that removal from a victim parent is warranted."

This case is similar to S.M.H. In that case, a mother's rights to her children were terminated because she was unwilling to appreciate the risks her relationship with the father, who had sexually abused other children, posed to her own children. S.M.H., 128 Wn. App. at 50, 57. In that case, as in this one, the mother continued to have contact with the father despite a no-contact order, and despite the fact that the father refused to treat his own parental deficiencies. Id. at 57. The mother also testified at the termination trial that she did not believe the father posed a risk to the children. . Id. at 55. And, the mother minimized or made excuses for the father's behavior. Id. at 57. Cf. In re Dependency of B.R., 157 Wn. App. 853, 872, 239 P.3d 1120 (2010) (order of termination reversed where mother acknowledged the danger posed by her partner and took steps that demonstrated she could set boundaries and protect her children from harm).

---

[11] Amici additionally contend that "[b]laming the victim parent in child welfare proceedings" violates that parent's procedural and substantive due process rights. We do not address this argument because it is inadequately briefed. See, e.g., State v. Gonzalez, 110 Wn.2d 738, 752 n. 2, 757 P.2d 925 (1988).

E. Sibling Contact

MacArthur contends that the trial court erred in failing to make a finding regarding the status of the children's relationship with their younger sibling A.M. She contends that this court should remand for the trial court to make the required finding.

RCW 13.34.200(3) provides that "[a]n order terminating the parent-child relationship shall include a statement addressing the status of the child's sibling relationships and the nature and extent of sibling placement, contact, or visits." Compliance with RCW 13.34.200(3) is mandatory.

Here, the trial court found:

> 2.8 The status of the child's sibling relationships and the nature and extent of sibling placement, contact[,] or visits is as follows: [T.O.] and [A.B.] reside together. [A.H.] resides in a separate foster home and [E.H.] is currently residing at Ruth Dykeman Children's Center. Their older brother [J.W.] resides out of state with his father. The care providers here in Washington have ensured that visits have been facilitated between the siblings. It is likely that some contact will continue following the children's adoptions.

MacArthur is correct that the trial court's finding does not acknowledge A.M. Because MacArthur concedes this is not reversible error, we remand so that the trial court may make the required finding as to A.M.

II.    Appointment of Counsel for Children

MacArthur contends that the juvenile court erred in concluding that the Fourteenth Amendment to the Unites States Constitution did not warrant appointment of counsel for the children. In actions under chapter 13.34 RCW, a

19

court may, but is not required to, appoint counsel for children.[12]  RCW 13.34.100(7), Juvenile Court Rule (JuCR) 9.2(c)(1).  In considering whether to appoint counsel for a child in a termination proceeding, the court must conduct the three-part balancing test outlined in Mathews v. Eldridge, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).  In re Dependency of M.S.R., 174 Wn.2d 1, 14-15, 271 P.3d 234 (2012).  That test requires that the court weigh three factors: (1) the private interests at stake in a given proceeding; (2) the government's interest; and (3) the risk that existing procedures will lead to erroneous deprivations of a private right.  Mathews, 424 U.S. at 335.  We review a decision whether to appoint counsel for children pursuant to RCW 13.34.100(7) for abuse of discretion.[13]  M.S.R., 174 Wn.2d at 11-12.

Here, the record shows the juvenile court properly analyzed the three Mathews factors.  As to the first factor, the private interest at stake, the juvenile court found that the children "have a private interest in their relationships with their siblings and with their parents, and in their physical and emotional safety."  Neither party disputes that the children have significant liberty interests in a termination proceeding "in being free from unreasonable risks of harm and a right

---

[12] In contrast, the court is required to "appoint an attorney for a child in a dependency proceeding six months after granting a petition to terminate the parent and child relationship pursuant to RCW 13.34.180 and when there is no remaining parent with parental rights."  RCW 13.34.100(6)(a).

[13] MacArthur argues that our standard of review should be de novo.  But, the only authority MacArthur cites is a Wyoming case.  We have found no Washington case that departs from the abuse of discretion standard of review for this type of discretionary ruling.

to reasonable safety; in maintaining the integrity of the family relationships, including the child's parents, siblings, and other familiar relationships; and in not being returned to (or placed into) an abusive environment over which they have little voice or control." M.S.R., 174 Wn.2d at 20.

Nor is it disputed that the State has a significant interest in protecting the children's welfare. As to this factor, the juvenile court found that "[t]he state has a[n] interest in insuring that the children are safe and that the children find permanence and early resolution of their dependency and termination matters."

The third factor, the risk of an erroneous decision, "depends on the legal and factual complexity of the situation and on the parties' ability to present their cases" and "may also turn on whether there is someone in the case who is able to represent the child's interests or whose interests align with the child's." M.S.R., 174 Wn.2d at 18.

Here, the juvenile court found:

1) There is little risk of an erroneous decision being made in this case due to the procedural protections in the statutory scheme and the strong advocacy of their appointed CASA Jon Carter.

2) In light of the ages and circumstances of these children, particularly [E.H.], taking an active role in the litigation has a high likelihood of being emotionally damaging and is not likely to provide sufficient assistance to the court in making its decision regarding the issues in their cases.

3) CASA has a duty to report to the court the stated interests of the children. The court is convinced that these children's CASA would clearly provide that information, along with his recommendation so the court can determine what is in the children's best interest.

21

MacArthur contends that an attorney "would have advocated for a resolution consistent with each child's <u>actual</u> interests." But, a CASA is obligated to advocate both for the child's best interest as well as the child's stated interest. RCW 13.34.105(1)(b), (f); <u>M.S.R.</u>, 174 Wn.2d at 20 (CASA is required to "inform the court of any 'views or positions expressed by the child on issues pending before the court.'") (quoting RCW 13.34.105(1)(b)). Here, the CASA testified as to each child's express wishes.[14] T.O. "was adamant" that she wanted to be adopted by her foster parents, whom she referred to as "mommy and daddy." E.H. indicated that he wanted to live either with his mother or any of his prior foster homes, as long as he could leave his group home.[15] A.H. said only, "I just want this to all be over." The CASA also acknowledged that the children would be emotionally impacted by terminating parental rights. We are not persuaded that, under the facts of this case, appointment of counsel would have changed the outcome of the proceedings. The juvenile court did not abuse its discretion.[16]

---

[14] The CASA did not ask A.B. her express wishes, explaining that A.B. was "not real vocal or articulate" due to her age.

[15] The Department also stipulated that, if asked, E.H. would state that "he wants to live with his mother" and "that he loves her." This stipulation was part of an agreement to quash the subpoenas for the children.

[16] MacArthur also contends that counsel could have advocated for the children to be placed together. But, placement decisions are made in dependency proceedings, not termination proceedings. And, the juvenile court was obligated to appoint counsel for the children in the dependency proceeding if parental rights were terminated. RCW 13.34.100(6)(a). The juvenile court had previously ordered that appointment of counsel for E.H. would be expedited due to his placement in a group home away from his siblings.

In the alternative, MacArthur contends RCW 13.34.100(7) violates the Washington Constitution because article I, section 3 requires the universal appointment of counsel to represent each child in a termination proceeding. MacArthur argues that the Washington Constitution provides a broader due process right to counsel than the United States Constitution, based on the factors set forth in State v. Gunwall, 106 Wn.2d 54, 58, 720 P.2d 808 (1986).[17]

We presume that a statute is constitutional and a party who challenges the statute bears the burden to show beyond a reasonable doubt that it is not constitutional. Amunrud v. Bd. of Appeals, 158 Wn.2d 208, 215, 143 P.3d 571 (2006). But, where a case can be decided on nonconstitutional grounds, we refrain from reaching the constitutional issue. Isla Verde Int'l Holdings, Inc. v. City of Camas, 146 Wn.2d 740, 752, 49 P.3d 867 (2002). Constitutional error does not require reversal where the error was harmless beyond a reasonable doubt. State v. Coristine, 177 Wn.2d 370, 380, 300 P.3d 400 (2013). In determining whether an error is harmless, "we must 'conclude beyond a reasonable doubt that the . . . verdict would have been the same absent the error.'" State v. Brown, 147 Wn.2d 330, 341, 58 P.3d 889 (2002) (quoting Neder v. United States, 527 U.S. 1, 19, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)).

Here, we decline to reach MacArthur's constitutional challenge because, even if the trial court's decision not to appoint counsel violated the children's

---

[17] These are: "(1) the textual language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern." Gunwall, 106 Wn. 2d at 58.

rights under article I, section 3, the error was harmless beyond a reasonable doubt. As discussed above, the CASA, who was a retired attorney, met with each child regularly and asked them where they wanted to live. He communicated the children's express wishes to the trial court. Moreover, MacArthur was unfit to parent the children because of her continued relationship with Brown and her unwillingness to acknowledge the danger he posed to the family. Thus, even if an attorney had been appointed for the children and advocated for their return to MacArthur's care, the trial court's findings would still support termination.

III.    Right to Be Present

MacArthur contends that the trial court violated her due process rights by proceeding with the termination trial on a day that she was not present. Under the facts of this case, we disagree.

On the third day of trial, MacArthur did not appear. MacArthur's attorney requested a recess, stating that MacArthur had an upset stomach and could not attend that day. The State notified the trial court that it had planned to call five witnesses that day: counselors for A.H. and E.H., MacArthur's mental health counselor, Hudson, and Loeffler. The trial court ordered the State to reschedule the testimony of MacArthur's mental health counselor to a day that she could be present, but allowed the State to take the testimony of the remaining witnesses in MacArthur's absence.

Due process in a termination proceeding requires that parents have notice, an opportunity to be heard and defend, and the right to be represented by

counsel. In re Welfare of L.R., 180 Wn. App. 717, 723, 324 P.3d 737 (2014). The right to be heard "ordinarily includes the right to be present." In re Welfare of Houts, 7 Wn. App. 476, 481, 499 P.2d 1276 (1972). But, that right is not absolute. L.R., 180 Wn. App. at 723-24. To determine whether a parent's due process right to be heard is protected when they are unable to attend a termination proceeding, we apply the Mathews balancing test. In re Dependency of M.S., 98 Wn. App. 91, 94, 988 P.2d 488 (1999).

As to the first factor, MacArthur has a fundamental liberty interest in the custody and care of her children. Santosky, 455 U.S. at 758-59. But, this interest is "not absolute and must be balanced against the other factors." M.S., 98 Wn. App. at 95. The State has "a strong interest not only in establishing a stable and permanent home for the child, but also in doing it as soon as possible." In re Dependency of C.R.B., 62 Wn. App. 608, 615, 814 P.2d 1197 (1991). The State also has a "fiscal and administrative interest" in eliminating unnecessary delay. In re Dependency of T.R., 108 Wn. App. 149, 159-60, 29 P.3d 1275 (2001).

Given these competing interests, the third factor is dispositive. The third factor assesses whether there were sufficient procedural safeguards "to insure that the parent had a full and fair opportunity to defend—i.e., to present evidence, rebut opposing evidence, and present legal arguments." L.R., 180 Wn. App. at 725. "[T]he risk of error is low when the absent parent is represented by counsel and counsel is given a fair opportunity to defend the parent." Id.

25

Here, any risk of error from MacArthur's absence was minimal. MacArthur was ably represented by counsel. The trial court put procedural safeguards in place to reduce the prejudice in proceeding without MacArthur, including rescheduling MacArthur's mental health counselor until MacArthur could be present. And, the remaining witnesses did not provide evidence to support any of the findings challenged by MacArthur. For example, the counselors for A.H. and E.H. testified regarding only the therapy they provided to the children. Hudson testified regarding his criminal history and his desire to get to know T.O. And, Loeffler testified only briefly, primarily regarding his qualifications and the background of the case. Loeffler's testimony continued on subsequent days of the trial when MacArthur was present and able to assist her attorney. MacArthur fails to establish that her due process rights were violated by the trial court's decision to proceed with the third day of the termination trial in her absence.

IV.  Ineffective Assistance of Counsel

Hudson claims that he received ineffective assistance of counsel during the dependency proceedings.[18] He contends that due process requires a trial court in the termination proceeding to "expressly consider whether a parent's efforts to timely reunify were hindered by ineffective assistance of counsel during the dependency process." We need not address Hudson's due process claim

---

[18] Hudson was represented by a different attorney at the termination trial. He acknowledges that he received effective assistance during the termination proceedings.

because Hudson fails to establish that counsel in the dependency proceeding was ineffective.

Hudson's primary defense at the termination trial was that he wanted to have a relationship with T.O. while incarcerated, but that he was stymied by the failure of the Department and his attorney to help him. Hudson testified that when his attorney, a public defender with The Defender Association (TDA), sent him an agreed order of dependency in 2012, he signed it without understanding what it was. He claims he told his attorney that he wanted a DNA test to determine whether he was T.O.'s biological father, but that she did not respond to his request. He also testified that his attorney did not inform him he could request visitation with T.O.[19]

In support of his defense, Hudson offered the testimony of two witnesses: Amelia Watson, a managing attorney with the Office of Public Defense (OPD), and D'Adre Cunningham, the supervisor of the dependency unit at TDA. Watson testified generally regarding the duties of attorneys appointed to represent parents in termination proceedings. She testified that failing to assist a parent in establishing paternity fell below a reasonable standard of practice. Cunningham testified that when she reviewed the attorney's case file, there were pleadings missing and she did not find any record that the attorney had sent letters or court reports to Hudson. But, Cunningham testified that Hudson clearly had contact

---

[19] Hudson's attorney left TDA in June 2014 and Hudson was assigned a new attorney. Hudson's claims of ineffective assistance do not relate to the representation he received from June 2014 until the termination trial.

27

information for TDA, and that she did not know whether Hudson had ever contacted his attorney to request paternity or visitation. Cunningham also admitted she had no reason to believe that Hudson did not understand the dependency and dispositional order he signed.

To establish ineffective assistance of counsel, a party must show deficient performance and resulting prejudice. S.M.H., 128 Wn. App. at 61. Counsel's performance is deficient if it falls " 'below an objective standard of reasonableness based on consideration of all of the circumstances.' " Id. (quoting State v. Thomas, 109 Wn.2d 222, 226, 743 P.2d 816 (1987)). To satisfy the prejudice prong, a party must show a " 'reasonable probability that, but for counsels unprofessional errors, the result of the proceedings would have been different.' " Id. (quoting Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

Here, even if Hudson were to establish that his attorney's performance was deficient, he cannot establish prejudice. As discussed above, the evidence showed that Hudson already reasonably believed that he was T.O.'s biological father. Hudson told the Department there was "no issue whatsoever" regarding his paternity. Moreover, Hudson knew that services and visitation would not be provided unless he contacted the Department and requested placement, something he did not do until 2015. Because Hudson cannot establish that his rights would not have been terminated absent his attorney's alleged failings, we need not further address this claim.

We affirm the trial court's order terminating MacArthur's and Hudson's parental rights. We remand for additional proceedings consistent with this opinion.

WE CONCUR:

FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
2017 MAR 27 AM 8:22