
# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of | No. 76149-8-I |
| L.J., DOB: 12/10/13, | |
| Minor, | DIVISION ONE |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| Tijan Sumbundu, | |
| Appellant. | FILED: January 22, 2018 |

SPEARMAN, J.— Following a two and a half year dependency during which Tijan Sumbundu made little progress with court-ordered services, the superior court terminated his parental rights to his daughter, L.J. Sumbundu appeals, arguing primarily that the State failed to carry its burden of proving that L.J. has prospects for adoption

and that continuation of the parent child relationship diminished her prospects for early integration into a stable and permanent home. We affirm.[1]

## FACTS

Tijan Sumbundu is the biological father of a girl, L.J., born December 10, 2013. L.J. was drug affected at birth. The Department of Social & Health Services (Department) immediately filed a dependency petition and placed her in foster care. Shortly thereafter, her mother died of a drug overdose.

On April 21, 2014, the court declared L.J. dependent. Among other things, the court found that Sumbundu had not established paternity, gave "wholly inconsistent" testimony, lacked credibility, and had no stable "living situation or availability to care for the child." Ord. of Depend., Ex. 1 at 3. The court concluded L.J. "would be at significant danger for harm to her physical and psychological needs if placed in "[Sumbundu's] custody." Id. The court ordered various services, including a neuropsychological evaluation with a parenting assessment and follow-up treatment, random urinalysis (UA), and a drug and alcohol evaluation if Sumbundu had a positive UA result. Sumbundu subsequently tested positive for alcohol, marijuana, and cocaine on multiple occasions.

On June 4, 2015, the Department filed a petition to terminate Sumbundu's parental rights. The petition alleged in part:

---

[1] Sumbundu has moved to modify the court administrator/clerk's December 14, 2017 ruling about the case title. Because the court administrator/clerk's ruling is consistent with RAP 3.4 and the Court of Appeals General Court Order dated May 25, 2017, the motion to modify is denied. Gen. Order of Division I, In re Changes to Case Title (Wash. Ct. App. May 25, 2017), http:/www/courts.wa.gov/appellate_trial_courts/.

2

2.5 Throughout the dependency the father has demonstrated an unwillingness to participate in and/or successfully complete services offered to correct parental deficiencies. <u>The father has failed to substantially improve their parental deficiencies in the months following the entry of the disposition order.</u>

The father did genetic testing through LapCorp that indicates that he is the father but paternity has not officially been established.

. . .

The father is currently participating in parent coach/life coach through Washington National Counseling.

The father has not participated in mental health services nor has he participated in a drug/alcohol evaluation.

The father has not consistently complied with random urinalysis. When he has participated in urinalysis testing it has been positive for marijuana; cocaine and ETG (alcohol). The father denies using any substances.

<u>For these reasons, the father does not understand and is incapable of providing for his child's emotional, physical, mental, and developmental needs. The parent is incapable of safely parenting the child, and is currently unfit.</u>

2.6 Continuation of the parent-child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. The father has not provided the child with a stable home in the past. He has not demonstrated the ability or the commitment to provide the child with a stable home currently, and will not be able to do so in the near future despite the offer of remedial services.

This child is adoptable and has prospects for adoption. The child cannot be adopted unless parental rights are terminated.

The termination trial took place in September 2016. Following a week of testimony and argument, the court entered the following written findings of fact and conclusions of law:

2.3.2 There is no doubt that [Sumbundu] is devoted to [L.J.] and loves her. He has, overall, been very consistent with his visits and his interactions with [L.J.] during the visits are tender and loving·. [L.J.] clearly also very much enjoys these visits. She lights up when she sees her father and is affectionate and comfortable with him. However, love and good intentions are not enough to successfully raise a child.

2.4 Throughout the trial, in the testimony from the social workers, from Dr. Shepel and from the court's observations, it is clear that [Sumbundu] is not credible or transparent in his dealings with the department and providers and in much of his testimony. The trial began with [Sumbundu] refusing to provide an address, even when directed to do so by the court. He testified both that he lives with Jayda and her children and that he lives in the "family home," the address of which he still has not provided. In general, he indicated that he lives in the north end of Seattle but he told Senita Williams that he lives near the Columbia City Library. The court still has no idea where he lives or where he plans to live with [L.J.].

2.5 The first three elements of the statute are established by agreement of the parties and the documentary evidence before the court: The child has been found dependent; a dispositional order has been entered as to the father; and, [L.J.] has been removed from the custody of her parents for at least six month pursuant to a finding of dependency.

2.6 Ordered services and all services, reasonably available, and capable of correcting parental deficiencies have been understandably offered or provided.

2.6.1 The father did participate in a court ordered neuropsychological evaluation with Dr. Shepel. . . .

2.6.2 Further, the court specifically finds that [Sumbundu]'s testimony that he couldn't complete his evaluations at Community Psychiatric Clinic (CPC) and Sound Mental Health because of payment problems not to be believable. He simply did not return for follow up appointments. . . . Even when his teacher, Genevieve Corrin worked with him to get another appointment at Sound Mental Health, he failed to follow through. Further, it was [Sumbundu]'s decision not to return Mr. Parra's calls and texts that led to the premature termination of the life skills training--not a dereliction by either Mr. Parra or the Department.

2.6.3 The three social workers involved in this case each made repeated attempts to engage [Sumbundu]. In addition to scheduling in-person meetings, which [Sumbundu] often did not attend, they attempted to communicate through phone calls, texts and email. He was given service letters to reinforce the oral instructions. Although the father insisted throughout the case that English language comprehension was not a problem, Ms. Camp had the dependency order, the service letter and neuropsychological evaluation translated into Mandingo to try and ensure he understood his situation and the required services.

Special efforts were made in scheduling services.

2.6.4 Dr. Shepel also recommended mental health treatment and suggested wrap around services. However, because [Sumbundu] never completed a mental health evaluation, he could not be tiered for these services and could not be provided a specific treatment modality that may have been identified to help with any grief counseling or other mental health assistance he may have needed.

. . .

2.6.6 Dr. Shepel also recommended parenting coaching. Although the first referral was unsuccessful, ultimately this did occur with Mr. Parra, and the father did make progress with this service. However, when a second session with Mr. Parra was approved so that he could provide additional focus on life skills coaching, the father only participated in a few sessions before inexplicably discontinuing the service.

2.6.7 In order to be sure that the first neuropsychological evaluation was accurate, the Department recommended and provided an opportunity for [Sumbundu] to participate in a second evaluation with an interpreter. [Sumbundu] repeatedly declined the assistance of the interpreter. [Sumbundu] was difficult to reach and removed himself from contact with Dr. Shepel for four months. Dr. Shepel therefore did not have time to do a complete neuropsychological given the looming trial date, but rather did a psychological evaluation . . . in August 2016.

. . .

2.6.10 The father was also consistently provided an opportunity to document sobriety through program of urinalysis testing. While the father did provide a number of UA tests. He failed to consistently participate. . . . In addition, many of the UAs he did provide were positive for substances. Most were positive for alcohol and cannabis, but two tests were positive for cocaine and one early this year was positive for methamphetamine. The court does not find credible [Sumbundu's] explanation that the positive UA for cocaine was a result of dental work.

2.7 There is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.

2.7.1 The court considers near future from the position of the child. . . . CASA testimony and the testimony of the social workers demonstrate that, for a child of this young age, the near future is measured in weeks rather than in the many months it would likely take the father to address his deficiencies and be in a position to provide her with the stability she needs.

2.7.2 The father's deficiencies as assessed by Ms. Camp are his lack of insight into why his daughter came into care and the continuing need for care, his failure to understand or acknowledge his role in the child being dependent, his ongoing substance abuse problems, and his overall inability to regulate his emotions.

2.7[.]3 Dr. Shepel noted that in her second evaluation of the father, his participation in services had actually declined, and that she felt he had made no progress in addressing his deficiencies other than to make some progress in his parenting skills . . . . She felt that the visit reports . . . did show a bond with [L.J.].

2.7.2 She indicated that his behavior was worse in the second evaluation--more agitated and more easily triggered. He demonstrated no insight into his situation. His scores on the Adult-Adolescent Parenting Inventory were concerning. Only if the father were to fully engage in treatment, including substance abuse treatment, would Dr. Shepel recommend a transition to unsupervised visits and possibly reunification. He failed to take those steps at any point before or following her evaluation.

2.7.4 Dr. Shepel believes that even were the father to engage immediately, it would take at least a year before a serious transition home would begin. . . .

6

2.7.5 <u>There is no reason to believe that the father would seriously engage now, when he has failed to do so for nearly three years. Even were he to engage, it would take at least a year to begin a transition home--the court finds that this is [sic] not in this child's near future.</u>

2.7.3 <u>The many positive UA's for alcohol, the pattern of missing UA's, along with the other evidence and the failure to complete a substance abuse evaluation, are of great concern to this court.</u> [Sumbundu] testified that his alcohol use was limited to a beer or two once a week with his musician friends. The evidence belies this assertion. During his testimony, he testified vehemently that he had not been drinking the morning of the first day trial was scheduled, but Ms. Camp smelled alcohol on his breath and he admitted to her that he had consumed alcohol that morning. The court finds Ms. Camp credible in this regard. He appeared at one visit smelling of alcohol and disheveled, according to Ms. William, although she did not find that he presented a risk to [L.J.] in that visit. As noted above, the court does not believe that the UA that was positive for cocaine was a result of dental work. <u>The risks to this child presented by the father's substance abuse remain unaddressed and unlikely to be addressed in the near future.</u>

2.7.4 <u>The father's suggestion that he could provide a stable environment for this child in the near future with the support and help of his community and family is not credible.</u> It does not appear that he has a stable relationship with his family or that his extended family would assist him in raising [L.J.]. While it is unfortunate that Ms. Camp was not aware of a handwritten list of friends and relatives, . . .it is clear that <u>she repeatedly asked [Sumbundu] for contact information for his family and that he never provided it.</u> . . .

2.8     <u>Continuation of the parent child relationship clearly diminishes this child's prospects for early integration into a permanent and stable home.</u>

2.8.1 <u>[L.J.] has prospects for adoption and cannot be adopted while father's rights are intact.</u>

2.8.2 <u>Even if her current prospects for adoption became unavailable, there are additional adoptive resources that would be available if the legal relationship were severed between her and</u>

<u>her father to allow for [L.J.]'s early integration into an adoptive home</u>.

2.9     Termination of the parent-child relationship between [Sumbundu] and [L.J.] is in the child's best interest.

2.9.1 The current relationship between [Sumbundu] and [L.J.] is limited to four hours a week — when the father is able to meet all of his visitation commitments. While it is true that [L.J.] is bonded to her father and likely will grieve the loss of their relationship, <u>the long term damage to a child who remains in limbo, as described by Ms. Camp satisfies this court that termination is in her best interests</u>.

2.9.2 [T]he father, to a great extent, visited [L.J.]. However, the father had two significant periods where he did not visit [L.J.]. . . . There were a number of visits for which the father was late and several no shows. Although. . . the visits generally went very well, there were some issues, including a concerning incident . . . where Ms. Williams had to intervene because he was walking too close to the street with [L.J. and] two incidents of [Sumbundu] taking food without paying for it during visits . . . .

2.10    Based upon the evidence presented and court and findings above, <u>the court finds that [Sumbundu] is currently unfit to parent this child. The father's parental deficiencies related to substance abuse and mental health remain un-remediated. He remains easily triggered as evidenced in his interactions with a visit supervisor, his social workers, and. Dr. Shepel. These deficiencies continue to represent a risk to [L.J.] if she were returned to her father.</u> . . .

III. **Conclusions of Law**

3.2 Termination of the parent-child relationship between the above-named minor child and the father . . . is in the child's best interest.

3.3 The foregoing findings of fact and the allegations of RCW 13.34.180 and .190 have been proven by clear, cogent and convincing evidence unless otherwise noted.[2]

---

[2] Clerk's Papers (CP) at 282-87. (Emphasis added). Sumbundu assigns error to Findings of Fact 1.1; 2.8; 2.8.1; 2.8.2; 2.9; 2.9.1; 2.9.2; and 2.4.

The court entered an order terminating Sumbundu's parental rights. Sumbundu appeals.

## DISCUSSION

Parental rights are a fundamental liberty interest protected by the United States Constitution.[3] To terminate parental rights, the State must satisfy a two-step test. First, it must prove the following statutory elements by clear, cogent, and convincing evidence:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . . and
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.[4]

If the State satisfies these criteria, the court may terminate parental rights if it finds by a preponderance of the evidence that termination is in the "best interests" of the child.[5]

On review, unchallenged findings of fact are considered verities.[6] Challenged findings will be upheld "[i]f there is substantial evidence which the lower court could

---

[3] Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
[4] RCW 13.34.180(1)(a-f).

[5] RCW 13.34.190(b).

[6] In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).

reasonably have found to be clear, cogent and convincing . . ."[7] Because the trial court hears the testimony and observes the witnesses, its decision is entitled to deference. In re Dependency of A.V.D., 62 Wn. App. 562, 568, 815 P.2d 277 (1991). Consequently, we defer to the trier of fact on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence. A.V.D., 62 Wn. App. at 568; In re Termination of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011); State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Sumbundu contends the Department failed to prove "[t]hat the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home" as required by RCW 13.34.180(1) (f). We disagree.

RCW 13.34.180(1)(f) is chiefly concerned with "'the parent-child relationship and whether it impedes the child's prospects for integration, not what constitutes a stable and permanent home. The State does not have to prove that a stable and permanent home is available at the time of termination.'" (Emphasis added). In re Dependency of K.D.S., 176 Wn.2d 644, 658, 294 P.3d 695 (2013) (quoting In re Dependency of K.S.C., 137 Wn.2d 918, 927, 976 P.2d 113 (1999). The Department can satisfy RCW 13.34.180(1)(f) by showing that "prospects for a permanent home exist but the parent-child relationship prevents the child from obtaining that placement." In re Welfare of R.H., 176 Wn. App. 419, 428, 309 P.3d 620 (2013) (citing In re Dependency of A.C., 123 Wn. App. 244, 250, 93 P3d 89 (2004). In this case, the trial court found clear,

---

[7] In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

cogent and convincing evidence that L.J. "has prospects for adoption" and that "[e]ven if her current prospects for adoption became unavailable, there are additional adoptive resources that would be available if the legal relationship were severed between her and her father to allow for [L.J.'s] early integration into an adoptive home." F.F. 2.8.1, 2.8.2.

Sumbundu contends the court's findings are not supported by substantial evidence. He points out "that placement with the father was a primary plan throughout the dependency." App. Br. at 14. He concedes, however, that adoption was ultimately added as a *second* primary placement plan. Sumbundu also argues that "there was no evidence presented that the current foster caretakers were interested in adopting [L.J.]." Id. But he cites no authority requiring such proof. Moreover, the State Supreme Court rejected a similar argument in K.D.S., 176 Wn.2d at 657-58:

> In essence, [the father] argues that his relationship with [his daughter] cannot diminish her chances of integration into a stable and permanent home because she has no prospects for placement in such a home.
> Gladin attempts to revive an argument we have already rejected. We have noted that RCW 13.34.180(1)(f) makes no reference whatsoever to the type of stable home required in order to terminate parental rights. For example, in Esgate the appellant argued, just as Gladin does here, that the trial court improperly terminated his rights because his child had no prospects for adoption. 99 Wn.2d at 214, 660 P.2d 758. We rejected this claim, noting that "[h]ad the Legislature intended termination only in those cases where the child would be adopted, it could have so provided by substituting [adoptive home] for the words 'stable and permanent home.'" Id. (quoting former RCW 13.34.180(6)). The same logic applies to Gladin's contentions about guardianship or foster care placement. We have repeatedly stated that RCW 13.34.180(1)(f) focuses on "the parent-child relationship and whether it impedes the child's prospects for integration, not what constitutes a stable and permanent home. The State does not have to prove that a stable and permanent home is available at the time of termination." K.S.C., 137 Wash.2d at 927, 976 P.2d 113. The plain language of RCW 13.34.180(1)(f) merely requires the trial court to find that

11

the continued parent-child relationship diminishes the child's prospects of integration into a stable and permanent home. See K.S.C., 137 Wash.2d at 927, 976 P.2d 113.

Accord R.H., 176 Wn. App. at 428 ("K.D.S. reiterates that the State does not have the burden to prove a permanent placement exists at the time of termination").

In any case, the record supports the court's findings. Marissa Camp testified that from April 2015 until trial, she was either L.J.'s assigned social worker or the case supervisor. When asked why she recommended adoption, Camp stated:

A. [I]n considering . . . the consequences to [L.J.] to waiting longer have devastating consequences to her development, ultimately the course of her life, and I don't believe that waiting any longer is in [L.J.]'s best interest, and I'm concerned about the impact that even now this prolonged and uncertain period of her life is having on her.

Q. . . . . . And from your understanding of this child, do you — are you aware of any barriers to her being able to integrate into a permanent, stable home if she were legally free?

A. No.

Q. Okay. So the behaviors that you described, some of the emotional dysregulation, you don't -- you wouldn't anticipate that being a barrier for her?

A. I think that she needs resolution to her case so that she can work through those issues. I do not believe that she's going to be able to work through those issues and find resolution to them until there is some sort of certainty about her . . . future.

Q. And is it your understanding that the legal rights of the parents need to be severed before a child can be integrated permanently to an adoptive home?

A. Yes.

Q. All right. And when you were considering . . . your recommendation for a permanent plan, were there other options for permanence that you considered or that were available for you to consider in this case?

A. There were no other options available for consideration.

Q. All right. So absent being able to return to the father, <u>it was your understanding that the only other opportunity for permanence for this child would be through termination and adoption</u>?

A. Yes.

Q. Okay. <u>When a child is legally free, are there other opportunities, other possibilities for adoptive homes that would not be available if they were -- the parental rights remained intact</u>?

A. <u>Yes</u>.

Q. Okay. <u>So even if a current and stable placement were to disrupt, if a child were legally free, she might have more opportunities</u>?

A. <u>Yes, she would</u>.
Verbatim Report of Proceedings (VRP) at 659-61. (Emphasis added).

L.J.'s Court Appointed Special Advocate (CASA) submitted a sworn report containing the following:

[Q:] <u>Does the child have prospects for adoption</u>?

[A:] <u>Yes, in her current home, where she has resided since she was a few weeks old</u>.[8]

Thus, substantial evidence supports the challenged findings.

Sumbundu claims this court cannot consider the CASA's report because it was never admitted into evidence. But he cites no relevant authority requiring admission of the report. He also overlooks the fact that the report is mandated by statute,[9] prepared by an officer of the court,[10] sworn under penalty of perjury, and, most importantly, properly considered by the court under RCW 13.34.105 (1)(e) (the CASA "may make

---

[8] (Emphasis added)  CP at 160.

[9] RCW 13.34.105(1)(a) (the CASA has a duty to "investigate, collect relevant information about the child's situation, and report to the court factual information regarding the best interests of the child").

[10] GALR 2(f), 4; <u>see</u> Kelley v. Pierce County., 179 Wn.App. 566, 576, 319 P.3d 74 (2014).

recommendations based upon an independent investigation regarding the best interests of the child, <u>which the court may consider and weigh in conjunction with the recommendations of all of the parties.</u>") (Emphasis added); <u>In re Welfare of S.V.B.</u>, 75 Wn. App. 762, 767, 880 P.2d 80 (1994) (in upholding the court's consideration of oral, unsworn report after close of the evidence, court stated "[t]he law provides for the appointment of a guardian ad litem and for a report from the guardian to the court. Former RCW 13.34.100; <u>see</u> RCW 13.34.105. <u>Clearly, it also permits the juvenile court to consider the guardian's report.</u>") (Emphasis added); <u>see also</u> <u>Rayer v. Rayer</u>, 32 Colo. App. 400, 402, 512 P.2d 637 (1973) (holding that while Juvenile Probation Department's report regarding custody was not admitted into evidence, court properly considered report under statute requiring court to order and consider it, and report was part of the record and furnished in advance to parties so they could call and examine the report's author).

Sumbundu also challenges several findings related to the court's determination that termination is in L.J.'s best interest. He contends the court's findings that it had "no idea where [Sumbundu] plans to live with [L.J.]," and that he "missed two months of visits" with L.J. are not accurate. While it may have been an overstatement to say the court had no idea at all where Sumbundu planned to live or that he missed an entire two months of visits, the record supports the gist of the court's findings -- i.e., that Sumbundu had consistently refused to provide a residential address and had missed a number of visits. In any event, any inaccuracy in the findings is inconsequential. It is clear from the record that the challenged findings, were not material to the court's conclusion that termination is in L.J.'s best interest. <u>State v. Caldera</u>, 66 Wn.App. 548,

551, 832 P.2d 139 (1992) (an erroneous finding of fact that does not materially affect the conclusions of law is not prejudicial).

Last, Sumbundu moves to strike the brief filed in this court on behalf of the CASA. He contends the brief is not authorized by the relevant court rules and statutes. He concedes, however, that this court has discretion to accept the brief. In the Matter of Dependency of D.L.B., 186 Wn.2d 103, 106 n.1, 376 P.3d 1099 (2016) (denying motion to strike CASA brief and noting that "[t]he appellate court has discretion to accept such a brief for filing."); RAP 10.1(h) ("The appellate court may . . . on its own motion . . . authorize or direct the filing of briefs on the merits other than those listed in this rule."). We accept the CASA's brief on appeal and deny the motion to strike.

Affirmed.

Spearman, J.

WE CONCUR:

Mann, J.

Dwyer, J.